CHARLES A. DANOLDS, Respondent, *v.* THE STATE OF NEW YORK, Appellant.

Where a valid contract has been entered into, on behalf of the State by its duly authorized agents, for the construction of a public work, it cannot, in the absence of any stipulation authorizing it so  to do, destroy or avoid the obligation of the contract.

While it may refuse to perform and arrest performance on the part of the contractor, it is liable for the breach of the contract the same as an individual, and the contractor is entitled to claim prospective profits.

The constitutional provision which denies to the State the power to pass laws impairing the obligations of contracts applies as well to contracts made by the State as to those made by individuals.

The building commissioners appointed under the act of 1870 (Chap. 427, Laws of 1870), "in relation to the State Reformatory," had authority to let by contract the work of erecting the buildings provided for by the act.

Said commissioners let to the lowest bidders, and entered into various contracts for the work; after the contractors had entered upon the performance thereof, by the act of 1874 (Chap. 323, Laws of 1874) and the action taken under it, further performance was arrested, and the remaining work was let to other contractors who completed it. A claim for damages for the breach of the contracts, on the part of the State, which claim consisted principally of prospective profits, was presented to the State board of audit. It appeared that the contracts were fairly let and upon terms then favorable to the State, and an award was made in favor of the claimant.    On appeal taken by the attorney-general under the act of 1881 (Chap. 211, Laws of 1881), *held,* that in the absence of any provisions in the contracts prohibiting or inconsistent with the allowance of such prospective profits, the award was right.

The contracts contained provisions to the effect that in case the execution of the contract should be suspended on the part of the State, no claim for prospective profits or work not done should be allowed, but the contractor should have the right to complete the work when the State ordered it to be resumed. *Held,* that these provisions did not authorize or contemplate the entire abrogation or repudiation of the contracts, and did not protect the State from liability for the prospective profits, as the contractors were denied the right to complete the work when it was resumed.

The contracts also contained agreements on the part of the contractors that in case the quantities of work, as exhibited at the time of the letting, should be increased or diminished, they would perform at the stipulated prices and make no claim for damages in consequence of the change. *Held,* this did not authorize the abrogation of the contracts.

One of the contracts contained a provision that, in case of a suspension of the work for six months, by reason of a failure of the legislature to make appropriations, an estimate and account up to the time of suspension should be made and the contractors paid in full.    *Held,* that this provision did not affect the claim, as the contract was not suspended simply but repudiated.

*McKee* v. *U. S.* (12 Ct. of Claims, 504); *S. C.* (97 U. S. 233), distinguished.

*It seems* that if the State is not ordinarily liable for prospective profits, it may be subjected to such liability by legislative enactment, and the act constituting the board of audit (Chap. 444, Laws of 1876), which allows to claimants against the State the same measure of relief and justice as they would be entitled to were the claims against individuals, authorized the award made.

By the said act of 1881, authorizing appeals from decisions of the board of audit to the General Term of the Supreme Court, the General Term was clothed with the same power above specified, possessed by the board.

(Argued April 14, 1882 ; decided April 25, 1882.)

APPEAL under chapter 211, Laws of 1881, from judgment of the General Term of the Supreme Court, in the fourth judicial department, made January 11, 1882, which affirmed an award of the board of audit.

The material facts are stated in the opinion.

*Leslie W. Russell,* attorney-general, for appellant. The building commissioners obtained and could obtain no authority to enter into contracts that would tie up and embarrass the execution of the public duties of the sovereign power. (*Britton* v. *Mayor,* 21 How. Pr. 251.) When a contract between the State and an individual has been abrogated by the State, the measure of damages is that sum which will compensate the citizen for the actual loss sustained. (1 R. S. [Banks' 6th ed.] 600, §§ 223, 224; 3 Opinions Att'y-Gen'l, 216, 2 27; *Easton* v. *Pickersgill,* 55 N. Y. 310; *People, ex rel. Williams,* v. *Dayton,* id. 367; *Fort* v. *Burch,* 6 Barb. 60; 9 Wheat. 362; *Lansing* v. *Smith,* 4 Wend. 9; *Killinger* v. *The Forty-second St. R. R. Co.,* 50 N. Y. 210; Parsons on Contracts, 8; *Charles River Bridge* v. *Warren Bridge et al.,* 11 Pet. 544–546; Story on Agency, § 319; *Gibbons* v. *U. S.,* 8 Wall. 269; *Thompson* v. *U. S.,* 9 Ct. of Cl. 187; *McKee* v. *U. S.,* 12 id. 504; Constitution, art. 7, § 3; Laws of 1870, chap. 55, § 2.) Where performance is prevented by the act of the law, the contract is terminated. (2 Parsons on Contracts, 186; *Baylies* v. *Fettyplace,* 7 Mass. 324.) The measure of damages in such case is the value of the labor performed or the materials furnished. (*Jones* v. *Judd,* 4 N. Y. 411.) The act which authorized the appointment of the building commissioners (Chap. 323, Laws of 1874) and the one which terminated the contract entered into by them were public acts. (*Calkins* v. *Baldwin,* 4 Wend. 667; *Lansing* v. *Smith,* 8 Cow. 146.) The latter was an act which, in its sovereign capacity, the State was in duty bound to cause to be passed, but the fact of its passage gives this claimant no right to damages for injuries arising therefrom. (Cooley on Const. Lim. 284; *Jones* v. *U. S.,* 1 Ct. of Claims, 383; *Deming* v. *U. S.,* id. 190; *Wilson* v. *U. S.,* 11 id. 513; *Mayor, etc.,* v. *Sec-*

*ond Ave. R. R. Co.*, 32 N. Y. 261; *Britton* v. *Mayor, etc.*, 21 How. Pr. 251; *Presbyterian Church* v. *Mayor, etc.*, 5 Cow. 538.) The provision of the Constitution that a State cannot by law impair the obligations of a contract does not apply to a claim directly against the State, for the State may not be sued in any court by one of its own citizens, and so is not within the purview of the Constitution of the United States, which cannot be said to have contemplated such a contingency. (Sedgwick on Damages [4th ed.], 657; *Eddings* v. *Seabrook*, 12 Rich. [S. C.] 504; *Munn* v. *People*, 69 Ill. 81; affirmed, 94 U. S. 113; *Radcliff's Ex'rs* v. *Mayor*, 4 Comst. 195; *In re N. Y. C. & H. R. R. R. Co.*, 6 Hun, 149; *In re U. V. & J. R. R. Co.*, 35 How. Pr. 420.)

*Geo. B. Bradley* for respondent. The building commissioners had power to make the contracts in question, for the materials and construction of the buildings, etc. (Laws of 1870, chap. 427; *Lord* v. *Thomas*, 54 N. Y. 107, 109; *People* v. *Stephens*, 71 id. 527, 550; Laws of 1871, p. 1560; Laws of 1872, p. 1765; Laws of 1874, p. 393.) The presumption is that the legislature, when it made appropriations, was advised and knew that the contracts had been made. (*Brown* v. *Mayor*, 63 N. Y. 244; *People* v. *Flanagan*, 66 id. 242–3; *People* v. *Supervisors*, 68 id. 118, 119; *People* v. *Stephens*, 71 id. 527.) Prospective profits were properly allowed. (*Masterton* v. *The Mayor, etc., of Brooklyn*, 7 Hill, 61; *Devlin* v. *The Mayor, etc., of New York*, 63 N. Y. 25; *Clark* v. *Mayor, etc., of New York*, 4 Comst. 338; *Griffin* v. *Colver*, 16 N. Y. 489, 494–5; *U. S.* v. *Speed*, 8 Wall. 77, 84–5; *U. S.* v. *Smith*, 4 Otto, 214, 218; *Harvey* v. *U. S.*, 8 Ct. of Claims, 501; *Lord* v. *Thomas*, 64 N. Y. 107, 109.) The rule applicable to a claim of one individual against another for breach of contract has uniformly been observed as against bodies politic and corporate, whenever the question has arisen for adjudication. (*U. S.* v. *Smith*, 4 Otto, 217, 218; *U. S.* v. *Speed*, 8 Wall. 84, 85; *People* v. *Stephens*, 71 N. Y. 527, 549, 550.) The State has no sovereign power to invalidate

its contracts, and its duty is no less imperative to observe the stipulation of its contracts than that of an individual. (U. S. Constitution, art. 1, § 10 ; *Dartmouth College* v. *Woodward*, 4 Wheat. 519 ; *Fletcher* v. *Peck*, 6 Cranch, 137 ; *State of New Jersey* v. *Wilson*, 7 id. 165 ; *Planters' B'k* v. *Sharp*, 6 How. [U. S.] 301.) The legislative power to abolish an office, and to reduce the salary or compensation of the incumbent, when not prohibited by the State Constitution has no application. (*Connor* v. *The City of New York*, 2 Sandf. 355 ; *S. C.*, 1 Seld. 285 ; *Butler* v. *Pennsylvania*, 10 How. [U. S.] 402 ; *People* v. *Vilas*, 63 N. Y. 459 ; *McVeany* v. *The Mayor*, 80 id. 185, 190.)

EARL, J. By the act chapter 427 of the Laws of 1870, the building of the State Reformatory at Elmira was provided for, and the governor was authorized to appoint five persons to act as a board of building commissioners, who were empowered to purchase the site and proceed with the erection of the buildings for the reformatory, and were charged with the general superintendence of the grounds and the design and construction of the buildings. Pursuant to the provisions of the act, the governor appointed five persons to act as such building commissioners, who afterward, in the year 1871, entered into several contracts relative to the work to be done by them, three with George W. Aldridge and three with John Kiley. These contracts were all let to the lowest bidders for the work and materials, and there was uncontradicted proof tending to show that they were fairly let and made upon terms then favorable to the State. After they were made, they were all, with the consent of the commissioners, assigned to George D. Lord and Charles A. Danolds, who proceeded to perform them. They continued in the performance of the contracts until the year 1874, having prior to that time done work and furnished materials under them, for which they had been paid a large sum, when by the act chapter 323 of the Laws of 1874, and the action taken thereunder, the further performance of their contracts was arrested. At that time they had on hand a

large quantity of materials which they had not used, and there remained a large amount of work yet to be done before the completion of their contracts, the value of which, if done by them, would have amounted to several hundred thousand dollars.

Under the act of 1874 a superintending builder was appointed by the governor to take charge of the construction of the reformatory, and he refused to permit Lord and Danolds to complete their contracts, and he advertised for bidders and let the remaining work to other contractors, who completed the same. Thereafter Lord assigned all his interest in the contracts and in the claims against the State on account thereof to Danolds, who in 1878 presented a claim to the State board of audit for damages for breach of the contracts on the part of the State. The damages so claimed were mainly for prospective profits which the contractors would have made if they had been permitted to perform their contracts according to their terms and conditions. The claim was heard before the board of audit, and in April, 1879, it awarded to the claimant $65,000. From this award under the act chapter 211 of the Laws of 1881, the attorney-general on behalf of the State appealed to the General Term of the Supreme Court, where the award was affirmed and then he appealed to this court. The attorney-general here asks for a reversal of the award upon several grounds which for convenience will be considered under separate heads.

*First.* He claims that the commissioners appointed and acting under the act of 1870 had no authority to make the contracts. Under that act they were to purchase the land for the site of the reformatory and take the deed therefor to the people of the State. Upon the site thus purchased the reformatory was to be constructed and it was to belong to the State. The State was to furnish the money for its construction, which they were fully authorized and empowered to expend. There was no limitation placed upon their powers and there was no specification in the act as to the manner in which they should proceed in the expenditure of the money or in the construction of the buildings. They were the selected agents of the State, clothed with all the power necessary and usual for the discharge

of their duties. They could construct all the buildings under their own immediate supervision without letting contracts, or they could, as they did, let the entire work by contracts. We may take notice that it is usual for the State and for all public bodies to do work of this kind by contract; and that that method is the appropriate one for doing such work is recognized by the act of 1874, where it is specially provided that the reformatory should be completed by contract. There is, therefore, no plausable reason for saying that the building commissioners exceeded their powers in making these contracts. In making them they did not act for themselves but for the State, and the State became bound by them. That they were binding upon the State was recognized in the case of *Lord* v. *Thomas* (64 N. Y. 107).

*Second.* It is further claimed that these contracts contain provisions which defeat the claim for the prospective profits. One of the contracts contains this clause: " It is further mutually understood and agreed that, in case the execution of this contract shall be suspended by the parties of the second part at any time and for any cause, no claim for prospective profits on work not done shall be made or allowed; but the party of the first part shall have the right to complete the work when the party of the second part shall order it to be resumed; " and the other contracts contain provisions somewhat similar. These provisions did not authorize or contemplate the entire abrogation or repudiation of the contracts on the part of the State and an absolute arrest of the performance thereof. Then, too, if the language " the parties of the second part " found in these contracts is to be taken as meaning the building commissioners personally, it may be said that the execution of the contract was not suspended by them; but it was suspended by the act of 1874 and the action taken under that act. If by the parties of the second part the State was meant, then that provision cannot protect the State from liability for the prospective profits, because the contractors were denied the right to complete the work when it was resumed.

The contracts contain another provision substantially like this : Whenever the quantities of work, or any of them, shall in

any respect be increased or diminished below "the amount or amounts exhibited at the time of letting this contract, the party of the first part hereby agrees to perform the work at the prices stipulated in this contract and to make no claim for damages in consequence of such increase or diminution." This provision gave no authority to the State to destroy the contracts, but simply provided for the case of a change of plan in consequence of which the work might be increased or diminished. Here the work, when the performance of the contracts by Lord and Danolds was arrested, was given under changed plans to other contractors, by whom it was completed.

There was another provision in one or more of the contracts as follows : "It is further understood that in the event of the suspension of the work mentioned in this contract for the period of six months, by reason of the legislature failing to make the necessary appropriations to carry on the same, the party of the second part shall direct the superintendent and engineer to make up an estimate and account to the time of such suspension and present them to the commissioners, who shall review them, and when correct and satisfactory, shall proceed, if in funds, to pay the same, including the percentage reserved up to the time of such suspension." Here there was not a case of suspension of the work within the meaning of this provision ; but the contracts were entirely repudiated. This provision was intended simply to secure to the contractors full payment up to the time of suspension for all the work they had done, including the percentage reserved under the contracts, and nothing more.

It will be seen by a careful reading of the contracts that there is nothing in them which authorized the agents of the State to repudiate them or to absolutely arrest their performance without liability for damages. The contracts were binding upon the State ; it could refuse to perform them on its part and arrest the performance of them by the contractors, but it could in no way destroy or get rid of the obligation of them, and so it was substantially held in the case of *Lord* v. *Thomas.*

*Third.* It is further claimed (and this claim presents the important question to be considered in this case) that the State

cannot, like an individual, be made liable under such contracts for prospective profits. It is conceded that if these contracts had been executed between individuals, these prospective profits would have been proper items of damages to be recovered by the contractors, under the rules laid down in *Masterton* v. *The Mayor* (7 Hill, 61), and other like cases. But the claim is that the same rule does not apply to the sovereign when it enters into a contract; that it can repudiate its contracts and arrest their performance at any time with liability only for the fair value of the work done and materials furnished, and for actual damages, but not for prospective profits. We have given the careful consideration to this claim which its importance demands, without being able to give it our assent. The claim is certainly a novel one, having no support in reason and, so far as we can discover, in any reported case. The sovereign can contract and has very many occasions to do so ; it can build canals and public buildings, and engage in public works, and in carrying forward its projects it makes use of the instrumentalities which individuals use for the same purposes. It must be governed by the same rules of common honesty and justice which bind individuals. It is for its interest that its contracts should be binding upon all the parties thereto. If it can at pleasure violate or abandon its contracts, in the absence of any stipulation authorizing it to do so, there will be such uncertainty and risk attending all its contracts that it will go into the market for work and materials at a great disadvantage. As was well said by Judge ALLEN, in *People* v. *Stephens* (71 N. Y. 549), "There is not one law for the sovereign and another for the subject, but when the sovereign engages in business and the conduct of business enterprises, and contracts with individuals, whenever the contract in any form comes before the courts, the rights and obligation of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged in the dealer, contractor and suitor." So far as is needful, the sovereign can protect itself against prospective profits by stipulations in its

contracts, and in the absence of such stipulations it must be liable for such profits like individuals.  To hold that the State could exact performance of a contract while it was advantageous to it, and absolutely arrest performance and escape liability when performance became disadvantageous, would shock the public conscience.  It may happen, as is claimed in this case, that in the work actually done under such contracts there is a loss which may be made up by the further and complete performance of the contract.  Can the State arrest the further performance, deny the prospective profits, and thus throw loss upon the contractor?  It may be, too, as claimed in this case, that the contractors with a view to the performance of their contract, have sub-let much of the work and thus come under obligations to individuals.  Can the State arrest the performance of the contract and deny the contractors prospective profits while they are left under obligation for such profits to the persons with whom they have contracted?  Prospective profits in such a case stand in lieu of performance.  They belong to the contractor; they are a valuable right, a chose in action, property, which belongs to him in every sense of the word.  It cannot be doubted that if the legislature should in any special case enact a law which would specially and directly deprive the contractor of such prospective profits under an existing contract, the law would be unconstitutional, as impairing the obligation of contracts in violation of the Federal Constitution.  It has been long settled so as to be beyond controversy, that the constitutional prov'sion which denies to the State the power to pass laws impairing the obligation of contracts applies to all contracts made within its limits, as well contracts made by the State as those made by individuals.  (*Dartmouth College* v. *Woodward*, 4 Wheat. 519; *Fletcher* v. *Peck*, 6 Cranch, 87, 137; *State of New Jersey* v. *Wilson*, 7 id. 164.)  In *Fletcher* v. *Peck*, Chief Justice MARSHALL said:  " If, under a fair construction of the Constitution, grants are comprised under the term ' contracts,' is a grant from the State excluded from the operation of the provision ?  Is the clause to be considered as inhibiting the State from impairing the obligation of contracts between two indi-

viduals but as excluding from the inhibition contracts made with itself? The words themselves contain no such distinction; they are general and are applicable to contracts of every description." In *State of New Jersey* v. *Wilson*, the same learned judge said: " In the case of *Fletcher* v. *Peck* it was decided in this court, on solemn argument and much deliberation, that the provision of the Constitution extends to contracts to which a State is a party as well as to contracts between individuals."

These contracts were protected, not only under the constitutional provision referred to, but the right to these prospective profits, any advantage of value under them, was a species of property finding protection under both the Federal and State Constitutions, in the provisions that private property shall not be taken for public use without just compensation.

There is no common and universal usage in this State which denies the liability of the State for prospective profits which may be claimed under contracts made with it. It is matter of common knowledge that such profits have frequently been allowed and sanctioned by the legislature of this State. It has undoubtedly been usual in such contracts to provide against liability for prospective profits, and the very fact that such provision has been deemed necessary in such contracts evinces the understanding that but for such provision the liability would exist.

Under the act chapter 55 of the Laws of 1870, entitled "An act to abolish the contracting board and the system of repairing the canals by contract," contractors for repairs on the canals were authorized to surrender their contracts, and the canal board was also authorized to cancel such contracts; but it was specially provided that, in a case of a surrender or cancellation of any contract, the contractors should not be entitled to demand or receive, and should not be allowed for any prospective damages or any compensation for any prospective or unearned profits. It is probable that in the contracts dealt with by that act there was a provision authorizing the canal officials, upon the terms specified in the contracts, to cancel them, and the fourth and fifth sections of that act were simply intended

to provide an equitable mode for a settlement and adjustment of the contracts when canceled or annulled. The fact that the legislature deemed it important to provide that no prospective profits should be allowed shows quite clearly that it supposed the State might otherwise be made liable for them.

To deny the right or power of the State to arrest the performance of its contracts without liability for prospective profits in no way impairs its sovereignty. It may repudiate its contracts, it may refuse to perform them, but its sovereign right to destroy or impair the obligation of them is limited by the Federal Constitution. It may refuse to respond in damages and leave a claimant without any remedy, as it may refuse to pay its bonds; but the obligation remains. No legislative *fiat* can destroy or impair that.

The doctrine contended for by the attorney-general finds no sanction in the decisions of the Federal courts. In *United States* v. *Speed* (8 Wall. 77), the war department, by its proper officers, entered into a contract with Speed to furnish fifty thousand hogs to be slaughtered at a stipulated price, and only a small quantity of the hogs were furnished, and Speed presented to the Court of Claims a claim for damages for a breach of the contract on the part of the government, and the Court of Claims held that the true measure of damages was the difference between the cost of doing the work and what the claimant was to receive for it, making reasonable deduction for the less time engaged and for release from the care, trouble, risk and responsibility attending performance of the whole contract. Upon appeal from the judgment of the Court of Claims to the Supreme Court of the United States, Mr. Justice MILLER, reading the opinion, approved the rule as laid down by the Court of Claims and said: "We do not believe that any safer rule, or one nearer to that supported by the general current of authorities, can be found than the one adopted by the court," and he cited the case of *Masterton* v. *The Mayor* (*supra*), as the leading case in this country on the subject. There was no intimation in that case by the counsel or court that a claim for prospective damages could not be made against the government.

But the rule as applicable to such cases was sanctioned which is laid down in *Masterton* v. *The Mayor* as follows : " When one party to an executory contract puts an end to it by refusing to fulfill, the other party is entitled to an equivalent in damages for the gains or profits which he would have realized from performance." In *United States* v. *Smith* (4 Otto, 214), it was held that the United States was liable in the Court of Claims to a contractor who had agreed to supply the skilled labor and the materials for the erection of certain buildings for its use, for such damages as he actually sustained by reason of its improper suspension of the work. In that case the work was suspended for a time, but after the suspension the contractor was permitted to complete his contract. There was no hint in the case that a different rule was to be applied in the measure of damages in a case against the government from that applied in actions against individuals. In *Thompson's Case* (9 U. S. Court of Claims, 187), it was held, as stated in the head-note, that " where a contract obligates a quartermaster to receive one thousand mules within a specified period, but no consideration is expressed for the obligation, which is not reciprocal and does not bind the contractor, the contract is valid so far as the quartermaster suffers it to be performed ; but the contractor cannot recover prospective damages on mules which he had not procured when the contract was renounced by the other party." The inference is very plain that if in that case the obligation of the contract had been reciprocal and had bound the contractor, his claim for prospective profits would have been allowed.

There are cases in the Court of Claims such as *Jones and Brown's Case* (1 Court of Claims, 383), and *Deming's Case* (id. 190), and *Wilson's Case* (11 id. 513), in which it has been broadly laid down that the government as a contractor cannot be held liable for the public acts of the government as the sovereign, and that whatever acts the government may do, be they legislative or executive, so long as they be public and general they cannot be deemed to alter, modify, obstruct or violate the particular contracts into which it entered with individuals and thus subject it to liability for damages to individuals. But if

those cases, decided under a Constitution which does not prohibit the Federal government from impairing the obligation of its contracts, would otherwise be applicable to this case, here they can have no bearing as these contracts were violated by the particular act of 1874 and the authority expressly conferred by that act.

Nothing was decided adverse to the view we have expressed in the case of *McKee* v. *The United States* (12 Court of Claims, 504, and 7 Otto, 233). In that case in 1864 A. entered into two contracts with the United States to deliver a specified number of tons of hay at Fort Gibson and other points within the Indian Territory, which was then the theatre of hostilities, which contracts contained this clause : " It is expressly understood by the contracting parties hereto that sufficient guards and escorts shall be furnished by the government to protect the contractor while engaged in the fulfillment of this contract." He cut hay within that territory and payments were made to him for that which he delivered and for that which, with other personal property, had been destroyed by the enemy ; and having been prevented by the enemy from there cutting all the hay necessary to fulfill his contract, he sued to recover an amount equal to the profits he would have made had the contract been fully performed, and he alleged the United States did not " furnish sufficient guards and escorts for his protection in the cutting and delivery of said hay ; " and it was held in the Supreme Court that the contract was for the sale and delivery of hay and not for the cutting and hauling of grass ; that the obligation of the United States to A. was not that of an insurer against any loss he might sustain from hostile forces, but it was to protect his person and property while engaged in the effort to perform his contract, and that A. was entitled to the full value of the property actually lost by him, and having been paid therefor, his petition should be dismissed. It is thus seen that that case turns entirely upon the construction of the contracts there under consideration, and no claim was made therein by any one that the same rule as to damages did not apply to the government which applies to individual contractors.

SICKELS — VOL. XLIV.    7

In the case of *The Apollon* 9 (Wheat. 362), it was held that the probable profits of a voyage, either upon the cargo or freight, do not form an item for the computation of damages in case of marine torts. There is no suggestion in the case that the same rule would not be applied against the government which would be applied in actions against individuals. The rule laid down was said to be founded in public policy, and also to be adopted as most conducive to justice in such cases, certain and easy of application and preventive of expensive litigation.

In *Jones* v. *Judd* (4 N. Y. 411) the rule as to prospective profits laid down in *Masterton* v. *The Mayor* is fully recognized and reiterated, and that case gives no support to the contention on the part of the State in this case. A law of a general and public character, rendering it impossible for an individual to perform his contract, may excuse performance. But a law can never be upheld or have any effect, the special purpose of which is to annul or impair contracts.

I now repeat that it has never been decided in any case in this country that has come to my knowledge, and it has never been said by any judge so far as I can find, that the sovereign cannot be made liable for prospective profits when it has arrested the performance of its contracts precisely as individuals could be made liable for such profits.

The damages claimed here are, within the meaning of the law, actual damages; they are not speculative, remote, contingent or uncertain; they are capable of very precise estimation. The moment these contracts were signed, being valid and binding upon both parties, whatever value was in them belonged to the contractors; and when by the act of the State the contractors were deprived of that value, they suffered actual damages, for which upon general principles of law and justice they should receive indemnity.

The State board of audit was constituted by the act chapter 444 of the Laws of 1876. By section 2 of that act the board was to hear all private claims and accounts against the State excepting such as were required to be heard by the canal appraisers, and to "determine on the justice and amount thereof

and to allow such sums as it shall consider should equitably be paid by the State to the claimants." Under this statute, without reference to the general principles above discussed, it cannot be doubted that it would be the duty of the board of audit in all cases to allow to the claimant against the State what would be just and equitable, if the claim were made against an individual. Even if, as contended for by the attorney-general, the State would not ordinarily be liable for prospective profits upon the same rule that would make individuals liable, it could be subjected to such liability by an act of its legislature; and by this act it is clear that it was intended to allow to claimants against the State the same measure of relief and justice as could be awarded if the claim were presented against individuals. The act established a court to administer justice between the State and its creditors, and it cannot be supposed that the State intended one measure of justice for such creditors, while another measure of justice was administered in its other courts in litigations between its citizens. This award was, therefore, in any view authorized by the board of audit.

By the act chapter 211 of the Laws of 1881, an appeal was authorized to the General Term, and jurisdiction was conferred upon that court to decide, adjudicate and determine the action between the claimant and the State upon both the law and the facts " as shall be equitable and just," and thus the General Term was clothed with the same power possessed by the board of audit; and who can say that it was not equitable and just for the General Term to adopt the same measure of damages between the claimant and the State as would be applied in litigations between individuals ? We cannot say, therefore, that there was any error of law in the decisions made by the board of audit and the General Term.

We do not understand that there is any contention that any error was committed upon the facts. We must take these contracts as we find them; they may have been extravagant; but there is no proof that they were, or that they were founded in fraud or collusion. No proof whatever was adduced on the

part of the State, and the proof on the part of the claimant showed that his damages were about $100,000, and it is impossible for us to say that the allowance of $65,000 was not entirely just and equitable.

The judgment should be affirmed, with costs.

All concur, except Tracy, J., who took no part.

Judgment affirmed.