LOUVIN REALTY CORPORATION, Respondent, *v.* THE CITY OF NEW YORK, Appellant.

First Department, June 29, 1934.

*William C. Chanler* of counsel [*Paxton Blair, A. L. Marvin* and *Phillip W. Haberman, Jr.*, with him on the brief; *Paul Windels, Corporation Counsel*], for the appellant.

*M. Carl Levine* of counsel [*David Morgulas* with him on the brief; *M. Carl Levine*, attorney], for the respondent.

MARTIN, J. The plaintiff seeks to recover damages in this action for the alleged wrongful cancellation by the city of New York of its contract with the Maxwell Gibbs Corporation, plaintiff's assignor, dated November 6, 1929, for the construction of a part of the Kings County Hospital buildings in Brooklyn for the sum of $3,869,000.

The Maxwell Gibbs Corporation sublet its entire contract. The demolition work of fifteen buildings was sublet to Henry Jaffe who started wrecking the old buildings on the site on November 4, 1929, in order to prepare it for the general construction of the new hospital building, and continued through the week with between 100 and 200 men. Jaffe continued the wrecking up to about January 28, 1930, when he abandoned the job. At that time the only buildings remaining to be demolished were known and designated as the " chronic kitchen " and part of the dormitory for females.

On February 1, 1930, the Maxwell Gibbs Corporation entered into a contract to complete the demolition work with P. Makofsky & Son, who started work on February 2 or 3, 1930. Makofsky was on the job about a week when he stopped work. During January, 1930, the architect filed a certificate with the commissioner of hospitals in which he recommended that the contract be declared abandoned and the Maxwell Gibbs Corporation be directed to discontinue work because in his opinion certain clauses in the specifications had been violated.

On February 10, 1930, the commissioner of hospitals ordered the Maxwell Gibbs Corporation to discontinue work under the contract for the construction of the Kings County Hospital. Thereafter, and on or about April 22, 1930, the present action was commenced.

The theory of this action is that the contract was canceled without cause, fraudulently and in bad faith in furtherance of a " scheme " on the part of certain officials and agents of the city to deprive the plaintiff's assignor, Maxwell Gibbs Corporation, of its contract.

The city contends on this appeal that the architect was the sole and final arbiter of the performance of the contract under the provisions thereof, and that plaintiff cannot recover unless it establishes that the action of the architect in terminating the contract was unreasonable, collusive, fraudulent and taken in bad faith. It also contends that the contract is void on the ground of public policy because the plaintiff admitted that it was obtained through political influence. It is argued that the promise sued on, being based in part upon an illegal consideration, cannot be enforced, either in whole or in part, and that the contract is not validated by

its assignment, if it was void in its inception. The city says that in any event the judgment must be reversed because the court adopted an erroneous measure of damages and seriously erred in its rulings on the evidence and its charge to the jury.

The respondent contends that it proved conclusively that there was a binding agreement between its assignor and the city which was being properly performed by the plaintiff's assignor. It then sets out at length the methods alleged to have been used by the architect and deputy commissioner of hospitals to force the contractor to abandon the contract. The respondent says it was hampered in the demolition of the old buildings and was dictated to in the letting of subcontracts and in securing the bond. It is also contended by the respondent that the subcontractors were advised by the deputy commissioner that the general contractor was not wanted on the job and his payments would not be made, in consequence of which the plaintiff's assignor met with serious obstacles in the performance of the contract; that everything possible was done to get the plaintiff's assignor off the job, so that the contract could be awarded to another contractor and that the dishonest scheme was finally brought to a successful conclusion. It is further asserted that the architect charged the contractor with not proceeding fast enough with the work, although it was shown on the trial that the " chronic kitchen " building, which stood in the center of the plot on which the hospital was to be built, was being used and this prevented the contractor from demolishing it. The plaintiff contends that it could not prepare for the foundation work until it had the plans and until the site was available for excavating purposes; that it could not do any excavating until the buildings were removed from the site and further that the building directly in the center of the plot was not turned over to the contractor until after January 28, 1930.

The city says that the plaintiff was never able to do the work and never intended to do it. On this issue the jury found for the plaintiff. It will be unnecessary to further consider that question because of errors in the admission of evidence requiring a reversal of the judgment.

Several important questions of law have been submitted on this appeal with reference to the admission of evidence. The most important question, however, is that of damages. The parties appear to have entirely disregarded the general rule of damages applicable to a case of this character. The decision of that important question makes it unnecessary to consider the other questions here involved, especially in view of the fact that they are not likely to arise on a new trial.

It is argued now that the theory of damages was consented to by the city of New York, but the record shows that objection was made at the very outset when it was attempted to put in evidence subcontracts. A list of subcontracts and the prices at which the work was to be performed was thereafter admitted in evidence.

Subcontracts alleged to have been made with subcontractors were not only admitted in evidence, but the court in its charge finally told the jury in substance that the contractor was entitled to recover the difference between the contract price with the city and the amount that the subcontractors had agreed to accept as compensation for performance of the subcontracts. To this amount they were told to add the expense which the contractor had in partly performing the contract. Of course, this is not and never has been the rule of damages in cases of this kind. A subcontractor might agree to do the work for nothing, but that would not change the rule.

The well-known rule with reference to damages for breach of contract, where a contractor is suing for anticipated profits, has been many times ably set forth. Before considering the decisions on that subject, however, we will refer to a few which have condemned the method of proving damages by admitting in evidence subcontracts.

The Appellate Division, through Mr. Justice MILLER, in *Hirsh* v. *Press Pub. Co.* (141 App. Div. 357), said: " It is unnecessary to cite authority upon the proposition that the damages recoverable for breach of contract are such as may fairly be said to have been within the contemplation of the parties. While, of course, the certainty of proof required may vary according to the circumstances and necessities of the case, it has never been held, so far as we are aware, that a party claiming damages may have the benefit of favorable contracts, made by him with third parties after the making of the contract for breach of which damages are claimed. As well might the plaintiff have been permitted to show that some one had agreed to remove the material for nothing or that he had contracted to sell it for several times its market value as a basis for recovering, not the value of the property, but what he would in fact have realized by reason of his favorable contract. Such damages are not allowable."

In *Goepel* v. *Kurtz Action Co.* (179 App. Div. 687), after condemning the admission of just such evidence as that which was here admitted and which we have here under consideration, the court said: " If such evidence were received, it would lead to an investigation to ascertain the financial ability of the subcontractor. Moreover it might well be said that such damages would not

ordinarily be within the contemplation of the parties unless the contract was made with reference thereto, that is, with notice or knowledge that performance was to be sublet."

When we consider the great number of subcontractors who take work at or below cost and thereafter fail to completely perform because of that reason, it may be readily understood why such a rule would be improper.

The proper rule of damages is set forth in *McMaster* v. *State of New York* (108 N. Y. 542); *Masterton* v. *Mayor, etc., of Brooklyn* (7 Hill, 61); *Story* v. *N. Y. & Harlem R. R. Co.* (6 N. Y. 85); *Devlin* v. *Mayor* (63 id. 8), and *Brodie* v. *Fost* (123 App. Div. 749). These and numerous other cases have stated the rule so clearly and distinctly, there should be little difficulty in applying it.

In addition to the statements of the rule cited in many cases, it is very important to apply the additional precaution laid down in *McMaster* v. *State of New York* (*supra*), especially where contracts would have taken several years to perform.

In many instances where a breach of contract occurs at the outset of the work, the contractor immediately proceeds with other projects and devotes his time and attention and the facilities of his organization thereto. In any action in which damages are being sought for breach of contract, the fact that the contractor was free to engage in other enterprises and that his machinery and apparatus were not in use, or was used on other contracts for the time it would have taken to complete the contract, must be taken into consideration.

This very important item is well considered in *McMaster* v. *State of New York* (*supra*), where the court said: " The larger sum was reached by taking the difference between the contract prices and the estimated cost of the stone and cutting, and was the result of a mathematical calculation based upon data furnished by the witnesses. The general statement of the rule of damages in such cases is the difference between the contract price and the cost of performance, and in the case of contracts requiring for their performance a few acts and a brief period of time the rule is not difficult of application and will generally produce results sufficiently certain for the purposes of justice. But in the case of contracts requiring for their performance many acts and a series of years, the application of the rule is attended with more uncertainty and the question of damages becomes a complex problem not so easily solved. In such cases accidents and contingencies may and usually will intervene to vary results. * * * The contractors were required to take the stone from quarries in Orleans county and transport them about 100 miles to the asylum grounds

in Buffalo, and then cut them ready for the buildings. Capital, machinery and implements had to be supplied and kept for the performance, and during the five years there would be many contingencies and accidents to vary results and probably to detract from profits. In the estimation of damages for the breach of such contracts all these matters ought to be considered. In fixing the gross sum, however, we must assume that they were not allowed their proper influence. So, too, in estimating profits from the performance of such contracts requiring the labor, skill, supervision and care of the contractors, some allowance should be made for their time, and some deduction from gross profits should be made for that. By the breach of these contracts these three contractors were released from their performance and were set at liberty to employ their time in other enterprises. It cannot be assumed that they and their machinery and implements remained idle for the whole five years. That would be against all probability. It was worth something to them to have the control of their time for other business, and this, as we must infer, was not considered in fixing the gross amount of profits and for all these matters the board, before reaching its final conclusion as to the damages, made an allowance of a little over $30,000, and the sum of $75,000 represents their final judgment upon all the facts. In reaching the allowance or deduction of $30,000 for the care, labor, trouble, risk and responsibility which would have attended the performance of these contracts, we cannot say that the board erred. It is true that that sum is, in great measure, arbitrary and based upon no definite data. But it is as certain as any amount which may be taken as profits upon such contracts requiring years for their performance with all the risks, uncertainties and contingencies which must ordinarily attend such performance." (See, also, *United States* v. *Speed*, 75 U. S. [8 Wall.] 77, and *Danolds* v. *State of New York*, 89 N. Y. 36.)

While there are many other questions submitted on this appeal, some of which are probably not the subject of review because of failure to plead the defense of illegality, those referred to are sufficient. The other questions may be disposed of on a new trial, and for that reason it is unnecessary to consider them on this appeal.

In passing, however, we believe it necessary to call attention to some of the evidence offered and admitted on the trial of this action. The record on this appeal contains much evidence which should not have been offered or admitted and had nothing to do with the issues. It may be said that no objection was taken to a great portion of the incompetent evidence or to the questions asked or the answers made thereto.

To drag in the subject of political organizations, political parties, the names of politicians and their methods of doing business, the names of political clubs and of people who have consistently received adverse criticism in the newspapers, is reprehensible and should not be permitted in the trial of an action for damages, unless such evidence has some relevancy.

The plaintiff attempted to show that the contractors who finished the work secured favors during its performance from the city officials, and that many changes in the contract were made, although it was not shown whether or not these changes were necessary. It was then shown how said contractors performed their contract.

It is so apparent that the purpose of such testimony, together with many voluntary statements made by counsel, was to inflame the minds of the jurors against the city, which we must at all times remember is, in reality, the unfortunate taxpayers who must pay for the mistakes made by public officials.

We refer to these matters as the probable reason for the very large verdict rendered by the jury, and in the hope that on a retrial such a mass of irrelevant and immaterial evidence may. be eliminated.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

FINCH, P. J., MERRELL, O'MALLEY and UNTERMYER, JJ., concur.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.