**INDIANA & MICHIGAN ELECTRIC COMPANY and American Electric Power Service Corporation, Appellants,**

v.

**TERRE HAUTE INDUSTRIES, INC., and Insurance Company of North America, Appellees.**

No. 1–882A245.

Court of Appeals of Indiana, First District.

April 30, 1987.

Rehearing Denied June 12, 1987.

Thomas W. Yoder, C. Erik Chickedantz, Livingston, Dildine, Haynie & Yoder, Fort Wayne, James G. McDonald, Jr., Princeton, for appellants.

Charles R. Nixon, Robert J. Fair, Fair & Nixon, Princeton, Hansford C. Mann, Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, James O. McDonald, Everett, Everett, McDonald & Ireland, Gus Sacopulos, Sacopulos, Johnson & Hahn, Terre Haute, for appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Appellants, Indiana & Michigan Electric Company (I & M) and American Electric Power Service Corporation (AEPSC), defendants and counterclaimants in trial court, appeal an adverse judgment for actual and punitive damages for breach of contract, rendered by the Gibson Circuit Court without a jury, in favor of appellee Terre Haute Industries, Inc. (THI), plaintiff and counterdefendant in trial court. The trial court further entered judgment in favor of THI on I & M's counterclaim. The trial court previously had entered summary judgment in favor of Insurance Company of North America (ICNA), THI's surety upon its performance bond to I & M, which action is a part of this appeal.

We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

The material issues in this appeal are fact sensitive, requiring a detailed statement of facts for their resolution. The evidence most favorable to support the judgment is as follows. I & M, a corporation engaged in the generation and distribution of electric energy, is a wholly-owned subsidiary of American Electric Power (AEP), a holding company which controls numerous other electric utilities. AEPSC,

likewise a wholly-owned subsidiary of AEP, planned and executed the project under discussion here as an agent for I & M, although the contracting party was I & M. The Indiana Air Pollution Control Board (APCB) is a public body authorized to regulate businesses, including utilities, with reference to air pollution. For a number of years prior to 1977, APCB had been exerting pressure upon I & M to install, in its Breed generating plant in Sullivan County, Indiana, an electrostatic precipitator, an apparatus calculated to control air pollution created by coal-fired generators. Eventually, APCB fixed certain deadlines for compliance. Throughout this opinion we will use, for brevity's sake, the designation "I & M," but such designation will include acts of AEPSC unless otherwise stated.

On or about March 4, 1977, I & M completed plans and specifications that divided the project into a number of separate contracts, of which the contract between I & M and THI was but one. The contract, which includes all bid documents, plans, specifications, and general conditions, required the contractor to furnish "all specified materials and all necessary supervision, labor, tools and equipment for the installation of electrostatic precipitators, miscellaneous platforms, elevator and stair tower and related work" at the Breed plant. *Record*, vol II at 377. I & M was required to furnish all material which would be fabricated by other contractors and suppliers. Essentially, it was a labor contract. Bid documents provided for completion of the contract in 21 months, or 441 working days, computed upon a five-day, forty-hour work week. The contract would be let by May 1, 1977, work would commence on May 16, 1977, and steel erection would commence by July 1, 1977. The contract, stating that time was of the essence, and providing for liquidated damage penalties, contained certain completion deadlines as follows:

(1) Complete and available for complete checkout by September 17, 1978;

(2) Complete and ready for tie-in by November 16, 1978;

(3) Complete and available for operation with existing system within ten weeks after the start of the tie-in outage.

These completion deadlines were related to the APCB mandate.

The contract contained provisions relieving the contractor from sanctions where delays were caused by strikes, lockouts, fire, unusual delays in transport, unavoidable casualty, and other similar causes beyond the control of the contractor. The contractor was required to absorb the first fifteen days of weather delays, but was excused from penalty for weather-related delays which exceeded that time. Nevertheless, the contractor was required to give written notice of claimed delays and resume work expeditiously.

Bid documents were circulated to THI in March 1977, and on April 18, 1977, THI submitted its bid to I & M for $7,033,733.00. That bid was not accepted by I & M by May 16, 1977, the commencement date, but I & M continued to study the bids. Of course, THI could not commence work prior to the award, but was required by the contract documents to commence work within one week after notice. In the meantime, I & M let a $26,000.00 service order, a contract of sorts, to THI, to commence on June 13 for the assembly of certain hoppers. By June 13, THI began pressing I & M to expedite the award, and the award was eventually granted to THI on July 1, 1977, forty-three working days after May 16, the stated commencement date. Nevertheless, though the completion dates were not changed, THI executed the contract on July 25. Significantly, THI made no objection to the completion dates at that time. On August 31, 1977, THI submitted a revised schedule, reflecting the late start, that would move the completion date back two or three months, but this revised schedule was not accepted by I & M. There is evidence that a custom exists in the industry which permits the shifting of the completion date to reflect a late award. By the end of September 1977, THI served notice on I & M that it would not be responsible for delay caused by the late award and the late start. Though I & M never

really agreed to THI's position, it seemingly acquiesced.

In August 1977, THI was further delayed fifteen days in the performance of the contract by the failure of Bay-Con, the foundation contractor, to complete its work. By November and December 1977, I & M, complaining of THI's failure to maintain schedule, commenced making demands upon THI to mount an accelerated schedule. Further delay was caused by inclement weather; the severe and prolonged winter of 1977–78 was one of the worst on record. Temperatures tumbled to sub-zero readings and deep snow accumulated. Laborers refused to work on the high steel complex because of the temperatures, precipitation, and slickness of the girders. Because of union pressure, THI could not discipline its employees for their refusal to work in the inclement weather. Though other crafts persevered and remained on the job when THI did not, those crafts worked in more sheltered areas and were not as exposed to the biting cold. THI claims that under the contract it was not chargeable with delays totaling 70.1 days caused by the inclement weather.

As a result of a project agreement between I & M and certain unions, THI's contract required that it employ only union craftsmen. Though the project agreement prohibited work stoppages, walk-offs and slow-downs, petty jealousies causing delays did arise among the crafts. THI presented evidence that it lost 12.3 days as a result of such activities and claimed it was entitled to credit therefor.

THI presented evidence that the steel and material furnished by other I & M contractors and suppliers contained fabrication errors, such as tolerances that were changed from one-fourth inch to one-eighth inch, columns that were one-half inch too short, and bolt holes that would not align. THI was required to check and correct these errors, double handle the steel, and the like, which consumed time and expense. THI claims it lost 36.3 days because of these errors. It demanded reimbursement for such time and expense, but I & M refused to pay.

The bitterly disputed causes of these delays is the fundamental issue in this case. I & M claims that the cause of much, if not all, of the delays was the fault of THI alone. It argues that THI signed the contract with knowledge of the completion dates, without protesting the late award, and was bound by the contract. Its witnesses testified that there always exists a certain amount of misfabrication and other errors in any large job involving thousands of parts and hundreds of thousands of bolt holes. Reaming and fitting is to be expected. It claims that 36.3 days' delay claimed by THI is greatly exaggerated, as only four to six days would be sufficient to correct those matters. It charges that delay was caused by THI's not having a crane for six weeks. While not disputing labor problems, I & M claims that the causes of them were THI's failure to organize the work activity, failure to supervise the work, failure to provide adequate tools, on-site drunkenness by THI's management, and blatant acts of favoritism. Such incompetence caused low morale among the crafts and impeded productivity. I & M claims that weather delays were also greatly exaggerated because there were many days that men could have worked, but did not. I & M claims THI failed to plan and organize its work in order to provide ground assembly in sheltered areas and inside work on inclement days. I & M notes that other crafts worked in the same area after THI's personnel went home. It concludes that only twenty days' extension should be allowed for delay due to inclement weather. Finally, I & M claims that THI utilized insufficient scaffolding.

By the end of 1977, THI began to claim extensions of time for delays which allegedly occurred beyond its control. There is no dispute between the parties that by January 1978, the project was seriously behind schedule. However, THI claims that, at that time, it was forty days ahead of schedule, as properly extended because of delays beyond its control. At that time, I & M demanded that THI present an acceleration program designed to bring the project back on schedule. Such a program, to commence in March, was presented by THI,

which included second shift activity, an additional crane, and extra manpower, supervision, and equipment. It also included extra pay for THI. I & M refused to accept it. THI presented evidence that I & M then encouraged it to embark on an acceleration, which it did, and by June 1978, had advanced approximately $100,000.00 for extra costs. THI demanded that I & M pay such costs. I & M refused. Therefore, on July 12, 1978, THI notified I & M that it would cease work. This impasse led to the controversial "roof release agreement." In reality, this was an acceleration agreement designed to buy back lost time and to finish and release to the mechanical and electrical contractors the so-called upper penthouse roof so those contractors could perform their contracts. At trial THI interpreted the roof release agreement as rendering the original milestone completion dates no longer valid. THI claims that I & M realized the plan would not buy back all of the lost time. THI claimed it made up eighteen days. I & M claims forty-three days. Under this program I & M paid an additional $507,912.00.

It is clear from the record that, throughout the performance of the contract, there were numerous reports, meetings, verifications, consultations and negotiations between THI and I & M about the status of the contract and the failure to maintain schedule. The record is equally clear, that commencing September 26, 1977, when it notified I & M that it would not be responsible for the late start, THI demanded of I & M what it perceived to be all of its rights under the contract as to extensions of time, and demanded pay for extra work. It did not acquiesce to I & M's counterdemands. THI claims that it lost 176.07 days for reasons beyond its control; eighteen days were made up by the roof release agreement, and it was required to absorb fifteen days' weather delay, leaving 143 days' excusable delay, which it was entitled to as an extension of time before it would be considered behind schedule.

The method that THI used to calculate the number of days lost was called the "critical path" method. After its discharge, and in preparation for trial, THI's controller, James Stalt, audited all of THI's previous lost-time reports. THI then employed an outside expert, Ralph Stephenson, who, by studying these records, performed a critical path analysis after the fact. Such analysis was not performed by either THI or I & M during the progress of the contract. The critical path is an esoteric concept described by THI as follows. On any construction schedule there is a unique path of activities that has no discretionary time to absorb delays. The critical path through the schedule is a series of activities, one following the other, all the way through the project from beginning to end, that have no discretionary time, or "float." If a day is lost to the critical path it is lost to the schedule, regardless of how many man-hours are worked that day on other activities. When the productive operations of the erection process which are on the critical path are interrupted for reasons beyond the contractor's control, even by an unknown problem, the time until that operation can be resumed productively is the time claimed for schedule extension. In quantifying the time lost beyond it's control, THI summarized and reported only lost time impacting on the end date, and did not report time lost on noncritical path activities, which are not a proper cause for schedule extension. THI did not report delays caused by its own errors. Delay to the critical path activity delays the project and justifies the extension. Other lost time that is not on the critical path can be made up and does not justify an extension.[1]

I & M concedes that, generally, the critical path analysis is the proper approach in determining lost time, but disagrees as to the manner by which it was performed. THI's expert posits that I & M omitted the factor of causation. It does appear that the critical path analysis measures only lost time, and does not determine the cause of lost time. I & M, in turn, advanced a

1. The critical path is a very complex concept which was not understood by at least some of the job site supervisors who testified. It was presented by outside theorists conversant with the art, who made their study after the fact.

man-hour approach that treated all lost time equally, whether it was on the critical path or not. The trial court accepted the critical path approach.

Much weight is placed by THI upon the critical path method, which we believe is unduly emphasized. Both parties concede that the project was far behind the original contract schedule. The real questions are the causes of the delays and whether the delays would justify a contract extension, which would forestall THI's being in breach of contract for failing to maintain schedule.

By February 1979, the contract price had escalated to $8,121,603.00, of which $6,243,-761.00, or 80.7%, had either been paid or certified for payment. At this point THI claimed that it was ahead of the extended schedule by sixty-one days. I & M's officers feared that criminal penalties might be imposed against the corporation, and them personally, if the project was not completed by June 15, 1979, APCB's deadline. THI's optimum completion date was August 17 with some indication that it may go into the fourth quarter.

Also by February 1979, I & M being of the opinion that THI was at fault in not maintaining schedule, demanded an accelerated schedule at THI's expense. Because it considered that APCB's deadline was not within its contract, THI refused. Thereupon, concluding that the project would not be finished by June 15, I & M made the decision to replace THI because it failed to maintain schedule. Thus, the immediate catalyst for the termination was the refusal of THI to embark upon the demanded acceleration program and bring the project back on schedule. Termination was affected on February 22, 1979, by I & M under General Condition 28 of the contract, which reads as follows:

"If Contractor ... should fail to maintain the schedule of construction, ... then Owner, upon the certificate of Owner's Engineer that sufficient cause exists to justify such action, may, without prejudice to any other right or remedy, and after giving Contractor forty-eight hours' written notice, terminate the employment of Contractor and take possession of all materials, tools and equipment of Contractor on Owner's premises, and finish the work by whatever method it may deem expedient. In case of such termination, an estimate shall be made immediately of all work completed by Contractor, but it shall not be entitled to receive any further payment until the work provided for in this contract shall be wholly finished by Owner by such other method. If the unpaid balance of the contract price should exceed the cost of finishing the work, such excess shall be paid to Contractor. If such cost should exceed such unpaid balance, Contractor shall pay the difference to Owner."

*Record*, vol. XLVIII at 11988. At trial I & M presented evidence that the project at termination was 60% complete. After it terminated THI, I & M spent $5,100,601.00 to complete the precipitators. I & M's engineer, John Santoria, signed the certificate required by General Condition 28. Also, pursuant to General Condition 28, I & M, on February 22 or shortly thereafter, took possession of three cranes; one construction elevator; all scaffolding and planking; all temporary electrical lighting and distribution systems, including panels, owned by THI and located on I & M's premises, all of which I & M kept and used for approximately four months. There is no evidence that THI ever made a demand for its return, and THI concedes that the property was ultimately returned. THI billed I & M for its use. THI made no showing of any damage to the property.

THI commenced its suit on June 26, 1979, against I & M, AEP, and AEPSC. In Count I, THI sought compensatory and punitive damages from I & M for breach of contract in "failing and refusing to pay THI the amounts in the manner provided by the contract, and by wrongfully terminating the contract and seizing THI's equipment in February 1979...." *Record*, vol. II at 373. In Count II, THI sought compensatory and punitive damages from AEP and AEPSC for tortious interference in its contractual relationship with I & M. In Count III, THI sought compensatory

and punitive damages from I & M for taking possession of the equipment, cranes, elevators, scaffolding, planking, and electrical service, and converting it to its own use. In summary judgment proceedings, AEP was dismissed from the suit. I & M filed its counterclaim against THI in which it sought damages for breach of contract. It also made ICNA, the surety on THI's performance bond, a counterdefendant.

The basic issue in the case is THI's assertion that, although the project was behind the stated contract schedule, it was actually ahead of the schedule because the time frames had been extended by excusable events beyond its control. Therefore, when I & M discharged THI, it breached the contract.

I & M's position is that the delays were caused by THI's own fault. The trial, before the court without a jury, lasted 81 trial days and generated a 36,000 page transcript, which was bound into 138 volumes. Judgment for breach of contract, without designating the applicable paragraphs of the complaint, was entered in favor of THI and against I & M and AEPSC jointly in the amount of $16,933,700.00 as follows:

| "a. | Retainage and pre-judgment interest | $766,100.00 |
|---|---|---|
| b. | Lost profit from makeup on work of subcontractors | 95,230.00 |
| c. | Lost profit on contract for self | 381,653.00 |
| d. | Expense incurred for delay to THI caused by I & M | 105,000.00 |
| e. | Extra winter work expense because of late award | 151,000.00 |
| f. | Expenses in alteration of improperly prepared material | 108,000.00 |
| g. | Expenses incurred from improper drawings | 11,900.00 |
| h. | Improper material caused extra expense | 234,000.00 |
| i. | Expenses in discovering errors in plans | 102,000.00 |
| j. | Cancelling work orders 64 days after it had been completed | 4,900.00 |
| k. | Installing vanes not provided for in contract | 20,600.00 |
| l. | Expenses for interruption of work caused by mismarking, misdesigning and defects in material | 8,000.00 |
| m. | Interruption of work by other contractors | 12,000.00 |
| n. | Unloading shop assembled walkways | 5,500.00 |
| o. | Reimburse ICNA attorney fees | 27,817.00 |
| | | $2,033,700.00 |
| [p. | Pre-judgment interest from 6/30/79 on items a, b, and c.]" | |

*Record*, vol. XVII at 4514–5.

The trial court further awarded $2,900,000.00 in damages because THI was damaged by the firing in its future business, that is, business which it sought after being discharged. The trial court also awarded $12,000,000.00 in punitive damages. Other facts will be shown under that heading.

The findings are clear that, for both compensatory and punitive damages, the judgment was based solely on the breach of contract alleged only against I & M in Count I. Conversion, alleged in Count IV solely against I & M, was lifted and brought into the breach of contract count to support punitive damages. The trial court, in Finding 28, expressly negated tortious interference and libel as charged solely against AEPSC in Counts II and III. There was no finding of compensatory damages for conversion. The trial court found against I & M on its counterclaim for breach of contract.

## ISSUES

I & M presents issues I through XIV for review. We have condensed and renumbered them as follows:

 I. Choice of law (originally issue 1).

 II. Breach of contract (originally issues 2–6).

 III. Compensatory damages (originally 11).

 IV. Future profits (originally 10).

 V. Punitive damages (originally 7, 8, and 9).

 VI. Discovery (originally 12).

 VII. Failure to make certain findings (originally 13).

 VIII. Liability of AEPSC (originally 14).

## DISCUSSION AND DECISION

*Standard of Review*

The trial court made special findings of facts and conclusions of law. Under Ind. Rules of Procedure, Trial Rule 52(A), we will not set aside special findings made by the court unless they are clearly erroneous. "Clearly erroneous" means that, even if there is evidence to support the trial court's decision, the record leaves the reviewing court with the firm convic-

tion that a mistake has been committed. *Citizens Progress Co. v. James O. Held & Co.* (1982), Ind.App., 438 N.E.2d 1016; *Cornett v. Cornett* (1980), Ind.App., 412 N.E.2d 1232, *trans. denied; Young v. Bryan* (1978), 178 Ind.App. 702, 368 N.E.2d 1, 368 N.E.2d 3, *trans. denied.* In determining whether the findings are clearly erroneous, this court will construe the findings liberally in favor of the judgment. *Citizens Progress, supra.* However, nothing can be added to the findings of fact by presumption, inference, or intendment. *Id.*

■ A judgment is contrary to law where uncontradicted evidence leads to a conclusion opposite to that reached by the trial court. *Freiburger v. Fry* (1982), Ind. App., 439 N.E.2d 169. This court will consider only the evidence most favorable to support the judgment together with all reasonable inferences to be drawn therefrom. We will not reweigh the evidence nor adjudge the credibility of the witnesses. If there is evidence of probative value which will support the judgment, the decision of the trial court will be affirmed. *Michael v. Indiana Insurance Co.* (1984), Ind.App., 469 N.E.2d 1222; *Uebelhack Equipment, Inc. v. Garrett Bros. Inc.* (1980), Ind.App., 408 N.E.2d 136; *Dominguez v. Gallmeyer* (1980), Ind.App., 402 N.E.2d 1295, *trans. denied.*

## ISSUE I: *Choice of Law*

■ The contract between I & M and THI provided that the rights of the parties to the contract would be governed by the law of New York. In Finding 15, the trial court found that New York applied the "center of gravity" choice of law theory. The significant contacts in the case were in Indiana. Therefore, Indiana substantive law was applied. This is an application of the renvoi doctrine, which has been rejected in Indiana. *Maroon v. State Department of Mental Health* (1980), Ind.App., 411 N.E.2d 404, *trans. denied.* Additionally, it is our opinion that when parties agree to have rights under a contract governed by the laws of a particular state, it does not include a consideration of that state's choice of law, but only the substantive law.

The very purpose of inserting such a clause in a contract is to impose stability to the agreement, thus escaping the vicissitudes of vague choice of law concepts.

Nevertheless, such error on the part of the trial court does not necessitate reversal, especially in light of the result hereinafter reached. There is no demonstration that any significant difference exists in the basic contract law, upon which this case turns, between Indiana and New York.

## ISSUE II: *Breach of Contract*

In Findings 10 through 26, the trial court found the facts stated in the Statement of Facts which were most favorable to support the judgment. It found that as many as 125 days had been lost to the critical path because of late start, weather, misfabrication, and labor problems. It found that these delays were caused by I & M and its contractors, or otherwise for reasons beyond the control of THI. It found that the project was behind the stated contract schedule, although not behind the schedule as extended for lost time beyond the control of THI. It found that "while the evidence does not show THI to be without fault upon occasion, the evidence does establish the loss of time by [THI] due to misfabricated or mislabeled materials, which loss of time was to the Critical Path." *Record*, vol. XVII at 4500. It found that THI was within the extended schedule, and that as a result thereof, when I & M discharged THI, I & M breached the contract. As relevant here and in the section on punitive damages, the trial court found, in Finding 24:

> "It is clear to this court that [I & M] believed [THI] had an obligation to give the additional services necessary to speed up the release of the roofs and also at the same time speed up the entire contract as well at no additional cost to [I & M]."

*Record*, vol. XVII at 4502.

I & M attacks the findings concerning breach of contract. Specifically, it takes issue with the trial court's recognition of an extended schedule for late start, misfabrication, labor unrest, weather delay, insufficient credit for the acceleration pro-

gram, and critical path versus manpower approaches.

I & M argues that to grant THI an extension of 43 days for a late start amounts to a reformation of the contract. Contracts, I & M argues, can only be reformed for mutual mistake, but here, THI signed the contract with knowledge of the schedule, albeit two to three months late, and made no exception to the schedule. We agree with THI that certain ambiguities exist here. Though the contract contained stated deadlines, it also provided that work would commence on May 16, 1977, and that work would commence one week after award notification. Clearly, THI could not commence work until the award was made. There is evidence that there is a custom in the industry that, where there is a late award, the completion date is shifted by the number of days of the delay in the award of the contract. We do not agree that the evidence showed that I & M agreed to an extended schedule, but there is evidence of acquiescence to it on I & M's part. Certain authorities are helpful here, and we quote from THI's brief at 126–130.

> "It is long-settled Indiana law that words, phrases, sentences, paragraphs, and sections of a contract cannot be read alone. Rather, the entire contract must be read together and given meaning if possible, and the intention of the parties must be gathered from the entire contract. *Ahlborn v. City of Hammond* (1953), 232 Ind. 12, 111 N.E.2d 70. The meaning of a contract is to be determined from an examination of all its provisions, not from a consideration of individual words, phrases or paragraphs alone. *Osolo School Buildings, Inc. v. Thorleif Larson [Larsen] & Son of Indiana, Inc.* (1985), Ind.App., 473 N.E.2d 643, *trans. denied; Wabash Ford Truck Sales, Inc. v. Ford Motor Company* (1984), Ind.App., 472 N.E.2d 611, 614, *trans. denied;* (citing *Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, 1143, *trans. denied* ).
> In interpreting a written contract, the court's purpose is to give effect to the intent of the parties at the time the con-

tract was made and as reflected by the language they used. *English Coal Co. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, *trans. denied.*

> Parol or extrinsic evidence is admissible to show the intent of the parties where the contract or any of its terms is ambiguous, that is, susceptible of two conflicting constructions. *Id.; McGann & Marsh Company v. K & F Manufacturing Co.* (1979), Ind.App., 385 N.E.2d 1183, *trans. denied.* The test for determining whether a contract term is ambiguous is whether reasonably intelligent persons could differ as to its meaning. *English Coal, supra.*

> It is a cardinal rule of construction that a contract is construed most strongly against the party that prepares it. *Wabash Ford Truck Sales, supra.* That is, ambiguities are to be strictly construed against the preparing party. *English Coal, supra.* It is undisputed that I & M wrote the contract. Furthermore, as stated in *Rieth-Riley Construction Co. v. Auto-Owners Mutual Insurance Co.* (1980), Ind.App., 408 N.E.2d 640, 645:

>> 'In construing a contract, we must adopt the construction which appears to be in accord with justice, common sense and the probable intention of the parties in light of honest and fair dealing.'

> Industry practice or usage is admissible to show the intention of the parties as to those matters not clearly expressed. *Radio Picture Show Partnership v. Exclusive International Pictures, Inc.* (1985), Ind.App., 482 N.E.2d 1159, *trans. denied.*"

■ Under all of the circumstances, we agree with THI that an ambiguity existed, and that the trial court did not err in finding that the contract completion date should be extended by the amount of the lateness of the award.

The remainder of the argument presented by I & M under this issue is purely factual. It claims the decision of the trial court was based on the testimony of incompetent witnesses with little or no job-site

involvement, whose evidence is not credible. It simply asks us to reweigh the evidence and readjudge the credibility of the witnesses. We decline.

■ The conflicting evidence is set out in the Statement of Facts. The trial court chose to accept THI's version. We will not disturb that finding. Clearly, the evidence most favorable to the judgment is sufficient to support the findings and conclusions reached by the trial court. The trial court found that there had been as much as 125 days lost for reasons beyond the control of THI, but that THI was within the extended schedule. We find no error in the trial court's finding that I & M breached the contract by discharging THI.

## ISSUE III: *Compensatory Damages*

The trial court's finding of compensatory damages is in Finding 27(a) through (q), inclusive. Omitting (*o*), which we shall discuss separately, the findings are set out in full as follows:

"27. *Damages:* This Court now determines the evidence in this case establishes by a preponderance that [THI] has suffered compensatory damages from [I & M] in this case as follows:

(a) Amounts retained by [I & M] for work performed by [THI] for which proper invoices were submitted but not paid by [I & M] which amount to the amount of $766,100. In addition, the Court now finds that [THI] is entitled under the evidence to an award of prejudgment interest on this amount at the statutory rates from the date of each invoice.

(b) [THI] should receive the profit they would have received from the contracts of their subcontractors upon completion of the rest of the project due to the markup of those contracts, which amount is $95,230.

(c) [THI] should receive the profit it would have received for the remainder of the job had it finished, that is, the amount remaining on the contract less [THI's] cost (which did not occur), in the sum of $381,653.

(d) [THI] incurred expenses for delays in job progress caused by [I & M] for overhead supervision, small tools and crane useage [sic] in the amount of $105,000.

(e) [THI] incurred additional unreimbursed expense due to work being pushed into winter which was uncontemplated, due to [I & M] making late award of the contract, in the amount of $151,000.

(f) [THI] was furnished materials for erection that differed from that contemplated, that is improperly fitting penthouse panels, revised silo access ladders and weld-up construction steel causing additional expense to [THI] not contemplated in the contract in the sum of $108,000.

(g) [THI] is entitled to recover from [I & M] damages caused by not having proper drawings and for having to perform work due to revisions in drawings not contemplated in the contract in the sum of $11,900.

(h) The contract here provided the shell wall panels to have boltup construction, rather than requiring welding and the fabrication actually turned out improperly causing [THI] to expend extra time, and extra cost to [THI] of $234,000.00.

(i) While it is true that [THI] received reimbursement for Extra Work Orders performed for the most part, the payments received did not include time for payment for discovery of the problem. That is, when a piece doesn't fit, time and labor were expended discovering what was wrong, how to fix it, and then getting [I & M] to approve. [I & M's] policy was to pay only time to actually cure the problem. Under a fair construction of the contract [THI] should receive these discovery payments in the sum of $102,000.

(j) [THI] was damaged by [I & M] when [I & M] wrongfully cancelled Extra Work Order Number 64 after issuing it to [THI] and after [THI] had already performed the work, in the sum of $4,900.

(k) [THI] should recover the sum of $20,-600 from [I & M] because [I & M] required [THI] to install turning vanes in ducts which was work not required by the contract.

(*l*) [THI] should receive the sum of $8,000 from [I & M] for interruptions in work as shown by the testimony of Kennedy and Stephenson other than covered elsewhere in these findings, caused by mismarking, misdesigning, or other defects in materials furnished by [I & M].

(m) [I & M] required [THI] to interrupt its work and move out of an area to allow others to work on slabs on grade, causing delay and expense to [THI] in the sum of $12,000.

(n) The Contract provided for shop-assembled walkways and guardrails, which takes less time to unload than as they actually arrived, that is, unassembled. [THI] was required by [I & M] to unload them, causing extra expense to [THI] in the sum of $5,500.

\* \* \* \* \* \*

(p) This Court determines the act of discharge wrongfully caused [THI] to be required under its contract with [ICNA] to indemnify said insurer, at a cost to [THI] of $27,817.

(q) The Court further finds, in addition to amounts described herein, that the damages of [THI] described in paragraphs (b.) and (c.) herein were within the contemplation of the parties to the extent of being ascertainable with certainty and exactitude as demanded by [THI] as of June 30, 1979. The Court thus finds [THI] should receive prejudgment interest as to these amounts at the statutory rates of interest from and after June 30, 1979."

*Record,* vol. XVII at 4504–7.

I & M first claims that the entire judgment must be reversed because THI failed to comply with certain contractual and procedural preconditions. General Condition 27 of the contract provides that if the contractor claims compensation for costs or damage because of the fault of the owner it must, within ten days, file a written statement of such damage with the owner, and on the 15th day of each month file an itemized statement in regard thereto. General Condition 22 provides that the contractor shall file a notice of claim for any extra work within two weeks from the beginning of such extra work. Failure to comply with these conditions works as a forfeiture of the claims. I & M argues that most of the claims for extra work fall within these clauses and THI did not comply with them. However, it makes no attempt to articulate the specific matters. As to these generalities, we note that extra pay for extra work and delay were the subjects of ongoing disputes between THI and I & M from the very beginning, and the contract was escalated from $6,243,761.00 to $8,121,603.00 to reflect, we presume, at least some of the extra work and claims. Ind.Rules of Procedure, Trial Rule 9(C) provides:

"Conditions Precedent. In pleading the performance or occurrence of promissory or non-promissory conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed, have occurred, or have been excused. A denial of performance or occurrence shall be made specifically and with particularity, and a denial of excuse generally."

THI pleaded that it, in good faith, commenced the performance of its obligations under the contract and continued to perform in accordance with the contract, except to the extent that it was prevented from doing so by one or more of the defendants. In its answer alleging affirmative defenses, I & M failed to raise the defense of failure to comply with conditions precedent.

The affirmative defense of failure to perform a condition precedent must be particularly and specifically asserted in a responsive pleading. *United Farm Bureau Mutual Insurance Co. v. Wolfe* (1978), 178 Ind.App. 441, 382 N.E.2d 1018. Such issues are waived unless litigated in trial court or properly raised in a responsive pleading. *Id.; see also Indiana State Highway Commission v. Bates & Rogers Construction Corp.* (1981), Ind.App., 422

N.E.2d 400 (failure to plead a denial of performance specifically in responsive pleading waives the issue); Ind. Rules of Procedure, Trial Rule 8(C), (burden of proof of affirmative defenses). Additionally, I & M does not demonstrate that this matter was litigated in trial court as is required by *Wolfe, supra.*

■ I & M also argues that THI was not entitled to recover special damages because it did not allege them, as is required under Ind.Rules of Procedure, Trial Rule 9(G). That section provides:

"Special Damages—Damages Where No Answer. When items of special damage are claimed, they shall be specifically stated. The relief granted to the plaintiff, if there be no answer, cannot exceed the relief demanded in his complaint; but, in any other case, the court may grant him any relief consistent with the facts or matters pleaded."

Clearly, in a tried case the trial court may award all damages which are justified by the evidence. Closely related to the above arguments, I & M claims, without developing its theme, that since THI had not pleaded special damages, I & M was surprised at trial. The record reflects that pre-trial discovery revealed THI was claiming as damages: (1) additional costs due to interference by I & M; (2) lost profits due to its inability to complete performance; (3) interest; (4) damage to THI's profitability; and (5) litigation expenses. I & M has not demonstrated how it was prejudiced. Also closely related to these arguments is I & M's argument that the trial court erred in refusing it the right to discover THI witness Ralph Stephenson's lost time summary involving the critical path method, because such matter was work product. Since I & M had daily on-the-job supervision throughout, the amount of delay and the causes therefor were equally accessible to I & M and THI. Since both parties concede that the project was far behind schedule, and that is all that the critical path method measures, we fail to see how I & M was prejudiced.

Throughout the remainder of the argument involving special damages, the ques-

tion of pleading and proof of compliance with conditions precedent and discovery is raised. We will not repeat the above discussion.

■ It is well-settled law in Indiana and elsewhere that generally, the measure of damages for breach of contract is either such damages as may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things from the breach of contract itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach. Damages may not be awarded on guess or speculation, but must be ascertainable with reasonable certainty. *Western Union Telegraph Co. v. Biggerstaff* (1911), 177 Ind. 168, 97 N.E. 531; *Orto v. Jackson* (1980), Ind.App., 413 N.E.2d 273; 25 C.J.S. *Damages* sec. 24 (1966); 9 I.L.E. *Damages* sec. 24 (1971); 5 A. CORBIN, CORBIN ON CONTRACTS sec. 1000 (1964). The test for measuring damages is forseeability at the time of entry into the contract, not facts existing and known to the parties at the time of the breach; the test is an objective one. *Orto, supra.*

■ Where a contractor is prevented from completing a project by the owner, the contractor, as a part of its measure of damages, is entitled to its lost profit. *Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck* (1981), Ind.App., 422 N.E.2d 670, *trans. denied.* Lost profits may be compensable if the evidence is sufficient to estimate the actual amount for profits lost with a reasonable degree of certainty. *Uebelhack Equipment, supra.* A contractor is entitled to the benefit of its bargain. *Estate of Glueck, supra.* Profit is the contract price less cost. *Id.; Foster v. United Home Improvement Co.* (1981), Ind.App., 428 N.E.2d 1351, *trans. denied; Colberg v. Sebastian* (1943), 113 Ind.App. 94, 46 N.E.2d 716.

■ There must be some evidence upon which an award for damages can be made, but uncertainty of dollar amount does not prevent the award of damages. *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972),

154 Ind.App. 632, 291 N.E.2d 92. A party is limited in recovery to the loss actually suffered, and he is not entitled to be placed in a better position than he would have been in if the contract had not been breached. *Ogle v. Wright* (1977), 172 Ind.App. 309, 360 N.E.2d 240, *trans. denied.* Conversely, damages which do not arise naturally from the breach of contract, or which are not within the contemplation of the parties at the time the contract was entered into, are not recoverable. A promisor is not required to compensate the injured party for injuries which, when the contract was made, the promisor had no reason to believe would be a probable result of the breach. *Connersville Wagon Co. v. McFarlan Carriage Co.* (1905), 166 Ind. 123, 76 N.E. 294; 9 I.L.E. *Damages* sec. 24 (1971); 25 C.J.S. *Damages* sec. 24 (1966). A contractor is entitled to damages for any delay caused by the owner, including delays which extend the project into the winter season which increases the cost. *Osolo School Buildings, supra.* Delay damages are awarded for breach of an implied or an express contractual promise for extra costs. *Id.*

I & M has attacked each and every finding on damages made by the trial court in Finding 27, (b) through (q), inclusive. Under each heading, it asserts, without cogent argument, that the trial court erred in accepting the allegedly inherently incredible evidence presented by THI, and that the trial court erred in not accepting evidence presented by I & M. Each argument is essentially factual, yet nowhere in its brief is there any instructive summary of the evidence relating to the specifications or argument. Instead, I & M merely cites us to testimony addressing each damage item compiled in an appendix, or to the record. There are eight volumes of appendices, ranging from one to three inches thick, which contain verbatim copies of the transcript of the evidence as presented by various witnesses. These copies of the record, of course, contain all of the objections of counsel, all trial court arguments, and all quarrels between counsel. From this, we presume that I & M expects us to construct a factual base from which we could then determine that the trial court erred in accepting THI's version of damages. Ind. Rules of Procedure, Appellate Rule 8.3(A)(5) requires a summary of the relevant evidence and A.R. 8.3(A)(7) requires an argument to demonstrate how the facts relate to the law. I & M has failed to comply. Nevertheless, we have read this material, but conclude that I & M's argument is but a further invitation for us to reweigh the evidence and readjudge the credibility of witnesses. We remind I & M that an appellant bears the burden of demonstrating reversible error. *City of Fort Wayne v. Bishop* (1950), 228 Ind. 304, 92 N.E.2d 544; *Stauffer v. Lothamer* (1981), Ind.App., 419 N.E.2d 203. We observe that THI's evidence of damage is supported by bid estimates, and calculations of future expenses, overhead, crane usage, man-hour overruns, and projected profits.

■ Relevant to Findings 27(b) and (c), THI presented evidence that it was to receive a 10% markup on work performed by its subcontractors, and upon such basis, would receive a profit of $95,230.00. THI presented evidence of the difference between the remaining contract price and the remaining anticipated expenses, which would be its remaining profit of $381,653.00. I & M simply attacks the credibility of THI's witnesses. It also cites *Louvin Realty Corp. v. City of New York* (1934), 242 A.D. 181, 272 N.Y.S. 752; *Brodie v. Fost* (1908), 123 A.D. 749, 108 N.Y.S. 414, for the proposition that profits from subcontract work were not recoverable as contract damages. We reject distinctions between anticipated profits to a prime contractor arising out of subcontract work and profits generated by the markup on labor and material. Under the law discussed above, all profits anticipated by the parties are recoverable as damages for breach of contract. We find no error.

■ Finding 27(d) is supported by evidence presented by THI that it incurred expenses for delays in the job progress for overhead, supervision, small tools, and crane usage. Such element is supported by *Osolo School Buildings, supra.* THI had originally computed costs based upon 441

days on a man-hour basis, so every day spent on the project after that generated more costs. The damages here were estimated on a per diem basis for 21 chargeable days. I & M merely argues the sufficiency of the evidence. We find no error.

■ Finding 27(e) is supported by THI's evidence that, because of I & M's fault, the contract was extended into a second winter, when work was less efficient with a result that it incurred additional expenses of $156,000.00. This too, is supported by *Osolo School Buildings, supra*. I & M has merely attacked the evidence of THI. It has not shown any summarized facts nor made any cogent argument to demonstrate reversible error.

■ Damage awards in Findings 27(f), (g), (h), and (i) all involve extra work by THI, and I & M's arguments are similar to those above. THI presented evidence that because of the revision of contract drawings, and the discovery of misfabrications, mismatching bolt holes, and other defects, it not only was delayed in the performance of the contract, but it also expended extra costs, stated in the findings, to make corrections. Its evidence revealed inadequacies in the management and issuance of drawings, delivery of misfabricated and unfabricated material, the discovery and correction of defects, and the like. The evidence of the amount of extra cost was arrived at from a comparison of the original estimate of the job, which was based on previous experience, and daily construction records. I & M repeats its argument that its evidence shows that a certain amount of such problems always exist in a construction job. It argues that the overrun was greatly exaggerated and that THI was inept in the correction of the problems. We view this argument as another invitation for us to reweigh the evidence. We find no error.

Findings 27(j) and (k) involve damage awards for extra work orders in installing turning vanes in ducts which were not provided for in the plans. I & M presented evidence that the omissions were done at THI's request to facilitate erection. Again, this is an argument based on the conflict of evidence. I & M has not demonstrated error.

Finding 27(1) involves extra work arising from the interruption of the flow of work caused by the misfabrication, mislabeling, and design errors. I & M again argues the sufficiency of the evidence, claiming the errors were negligible and were to be expected. It has not demonstrated error.

Finding 27(m) involves evidence presented by THI that I & M and other contractors, by prolonging the pouring of a concrete slab under the precipitator, caused interference with its work and a resulting loss of efficiency. It cost THI a loss of a five-man crew for 58 days. Calculations were made in comparison with 900 other jobs. I & M merely argues that such evidence was incompetent and that THI knew of the interference problem when it bid. It has not demonstrated error.

Finding 27(n) involves evidence presented by THI that the contract provided a unit price for unloading steel. The units, which were supposed to be assembled were not, but were broken down and extra costs were involved in the unloading. I & M merely argues evidence and posits a distinction between shop fabricated and shop assembled. Again, it has not demonstrated error.

■ Finding 27(p) involves evidence presented by THI that, because of an indemnification agreement between it and its bonding agent, ICNA, it was required to pay ICNA $27,817.00 in attorney fees for ICNA's defense against I & M's counterclaim. I & M claims that there was no evidence in the record suggesting that such an element of damages was within the contemplation of the parties at the time the contract was entered into, as required by the authorities discussed above. There is no evidence that I & M even knew of the agreement. A prevailing party is not entitled to recover attorney fees absent a prior agreement or statute which provides for them. 9 I.L.E. *Damages* sec. 48 (1971). THI does not claim that I & M had knowledge of the agreement, or that such damages were within the contemplation of the

parties. Instead, it claims that I & M's obdurate behavior justified the award. We first note that THI, not I & M, commenced this litigation. Additionally, the trial court made no finding of obdurate behavior. Further, in Finding 27 the trial court found that "[THI] has suffered compensatory damages from Defendants in this case as follows...." *Record,* vol. XVII at 4504. Then it listed the items of compensatory damages in Finding 27(a) through (q), inclusive. The nature of an award of attorney fees for obdurate behavior, that is, where the behavior is vexatious in the extreme, is punitive. It is designed to reimburse a prevailing party who has been dragged into baseless litigation and has incurred expenses. *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127, 129 states:

"Where, however, a trial court finds that this strict standard has been met, it is clear that Indiana law permits the trial judge to exercise his discretion in awarding attorney fees...."

*See also Dotlich v. Dotlich* (1985), Ind. App., 475 N.E.2d 331, *trans. denied* (party who prosecutes the action cannot recover attorney fees). Here, the trial court made no such finding, but awarded the attorney fees as an element of compensatory damages for breach of contract. This is error and this award is ordered vacated.

▮ Finding 27(a) awarded pre-judgment interest for work performed by THI from the date of each invoice. In Finding 27(q) the trial court awarded pre-judgment interest for lost profits under 27(d) and (c) from June 30, 1979, because such profits were ascertainable with exactness as of that date. Pre-judgment interest, computed from the time the principal amount is due or demanded, is allowable where the terms of the contract make the claim allowable and the amount rests upon mere computation. *Indiana Telephone Corp. v. Indiana Bell Telephone Co.* (1976), 171 Ind.App. 616, 358 N.E.2d 218, *reh. granted,* 360 N.E.2d 610 (1977). It is not a question of whether the damages are liquidated, but whether they are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. Pre-judgment interest is not includable where damages are unliquidated and cannot be ascertained until judgment. *Portage Indiana School Construction Corp. v. A.V. Stackhouse Co.* (1972), 153 Ind.App. 366, 287 N.E.2d 564, *trans. denied; see also Southern School Buildings, Inc. v. Loew Electric, Inc.* (1980), Ind.App., 407 N.E.2d 240 (the test is not whether the parties have mutually fixed the amount in dispute, rather, the question is whether the principal amount is ascertainable by mere computation). We could speculate that Finding 27(a) contains retainage typical in such contracts, which is not due at the time invoices are submitted, but is due at completion of the project. We could speculate that there may be factual questions of whether lost profits under Finding 27(b) and (c) on the remainder of the job were ascertainable and rested on mere calculation. In *Portage Indiana School, supra,* the court disallowed pre-judgment interest on profits in a similar situation, because the ascertainment of the costs of materials, labor, engineering, administrative expenses, and other costs, rested upon more than mere calculation. However, in its brief, I & M does not so inform us. In a one-half page argument, it asserts that Findings 27(b) and (c) were not ascertainable as of June 30, 1979. It then, in a footnote, cites us to the motion to correct error, which in turn cites us to the humongous record. We are unable from the brief to reconstruct the factual base for I & M's argument. It has not demonstrated error by a proper presentation of facts and cogent argument.

We affirm the award of compensatory damages under Finding 27(a) through (n), inclusive, and (q). We reverse Finding (p). Finding 27(o) is discussed below.

ISSUE IV: *Future Profits*

In Finding 27(o) the trial court found:

"The evidence in the case establishes conclusively that plaintiff was damaged by the firing in its future business, that is, the business which it sought after being discharged."

*Record,* vol. XVII at 4507.

The trial court based its finding upon the testimony of THI's expert, Stephenson, and

fixed damages for future profits at $2,900,-000.00. THI supports its claim upon a theory that, because I & M breached the contract by discharging it, an odium attached to it and it lost face in the industry, so to speak, and therefore, its business was damaged. Finding 27 is a finding only for compensatory damages on a breach of contract, as the trial court found against THI on its libel claim. To support damages for loss of future business, THI, in its brief, shows the following. For the four-year period prior to its discharge on February 2, 1979, THI had a profit of $5,464,737.00. However, for the four-year period after discharge, its profit was reduced to $564,-469.00. THI had not been awarded a substantial contract since June 13, 1982, and was forced to restrict its operations. By 1982, a decline in net worth existed. I & M's counterclaim for breach of contract prevented THI from obtaining performance bonds, and the situation would continue until the litigation terminated.

In its brief, THI summarized the testimony of its expert, Stephenson, who calculated the amount of lost future profit, as follows:

"To determine THI's lost business and profits, consulting engineer Stephenson analyzed THI's bid history. Bid volume represents the acceptance of a company in its industry, and being permitted to bid jobs is essential to THI's health. Stephenson determined THI's historical 'hit average' or 'batting average' on its bids, that is, its percentage of successful bids. He then used a linear regression mathematical analysis to compare THI's post-termination business to its pre-termination business. His analysis showed that THI consistently obtained about 15% of the jobs it bid, both before and after termination; however, the number of jobs THI was permitted to bid decreased sharply after termination, so its business likewise decreased sharply. To determine how much of the decrease in THI's bid volume and business was due to being fired by AEP, as opposed to recession or other general business conditions, Stephenson used 22 different economic indicators to determine an appropriate adjustment of the curve which he had derived by linear regression analysis to reflect THI's historical and probable business if it had not been fired by [I & M]. After making that adjustment, Stephenson determined the difference in THI's actual post-termination business and the business THI would otherwise have had during the same period, taking into account economic conditions during that period. After determining that THI's profit would have been 10% of revenues during the post-termination period, even though THI had previously made 14% and 15% profit in some years, Stephenson calculated that THI had, because of its dismissal, lost $2,907,000 in profit in the 3.358 years from termination to the time of Stephenson's testimony. In Stephenson's opinion, as a consulting engineer with many years' experience in the construction industry, THI had been hurt critically, and the damage to its profits would continue for at least two to four years, because continued litigation, even on appeal, makes THI almost unbondable, with slim chances of being hired, so that the $2,907,000 amount of lost profits was very conservative. THI included in its October 31, 1979, financial statement, as accounts receivable $640,000 which THI had invoiced to I & M, but which I & M had not paid. Had THI not treated that $640,000 as a receivable the 1979 statement would have shown about a $400,000 loss, as compared to income before taxes of $1,230,853 for 1978 and $1,144,608 in 1977. THI's financial position declined about a half million dollars from 1981 to 1982."

*Appellee's Brief* at 58–9. Significantly, THI has presented no evidence whatever of any specific job that it failed to get that is attributable to the breach of contract, or any other specified reason.

The fundamental question here is whether lost future profits resulting from loss of face or damage to business reputation, which occurs from the mere breach of contract unaccompanied by defamation, abuse of process, and the like are recoverable as

compensatory damages for breach of contract. A review of the general law of damages for breach of contract discussed in Issue III discloses no authority which permits such recovery. THI has submitted a large number of authorities which hold that future profits are recoverable in tort and other instances related to breach of contract. We will discuss them in turn.

A number of Indiana cases are cited which address the subject of future profits, none of which involve future profits for damage to business reputation. *Biggerstaff, supra,* involved a tort action for damages for failure to deliver a telegram, which caused the plaintiff to lose specific business. *Uebelhack Equipment, supra,* involved a claim for damages for future profits for the breach of a contract to construct a grain elevator by harvest time. Because plaintiff could not operate, loss of future profits was allowed. In *Jerry Alderman Ford Sales, supra,* future profits were allowed because the defendant kept the plaintiff's truck, denying him the use of it. In *Connersville Wagon, supra,* future profits to a manufacturing company were denied on a breach of contract to deliver wheels for the manufacturing of plaintiff's carriages. The court held that such damages were speculative. *Id.* at 134, 76 N.E.2d 299. The same result was reached in *Acme Cycle Co. v. Clarke* (1901), 157 Ind. 271, 61 N.E. 561; *Western Gravel Road v. Cox* (1872), 39 Ind. 260; and *Griffin v. Colver* (1858), 16 N.Y. 489. In those cases the courts refused to permit recovery of future profits for breach of contract to supply goods and machinery. The courts in those cases reasoned that there was no notice to the defendant of any such potential claim at the time of entry into the contract, and where extraordinary liabilities were to be assumed by a party delivering goods, it should appear that he so understood at the time the contract was executed. In *Babson Bros. Co. v. Tipstar Corp.* (1983), Ind.App., 446 N.E.2d 11, *trans. denied,* the court permitted recovery in a suit for damage in tort where defendant's negligence caused a decrease in milk production. *Strong v. Commercial Carpet Co.* (1975), 163 Ind.App. 145, 322 N.E.2d 387, *reh. granted* 324 N.E.2d 834 (1975), *trans. denied,* involved a contract to lay carpet in which a metal stripping was left exposed. Plaintiff was injured and sued for damages. In *Claise v. Bernardi* (1980), Ind.App., 413 N.E.2d 609, plaintiff sought damages to credit and reputation because of breach of contract for sale of real estate. The court held, in effect, that there was no such cause of action. *Id.* at 612. Such damages can only be recoverable for libel, slander, malicious prosecution, abuse of process, or third party interference with a contract, all of which are torts. *See Terre Haute Regional Hospital, Inc. v. El-Issa* (1984), Ind.App., 470 N.E.2d 1371, 1382, *trans. denied,* (Neal, J., concurring).

The New York cases of *MacArthur Construction Corp. v. Coleman* (1983), 91 A.D.2d 906, 457 N.Y.S.2d 530; *Fifty States Management Corp. v. Niagara Permanent Savings and Loan Assn.* (1977), 58 A.D.2d 177, 396 N.Y.S.2d 925, both hold that damage to a business's reputation resulting from a breach of contract is not actionable, because it is not within the contemplation of the parties at the time of making of the contract.

THI has submitted additional authorities which it claims support its recovery of future profits as damages for loss of business reputation, customers, goodwill, credit, and bondability, which proximately result from a breach of contract. Such authorities are as follows: *R.E.B., Inc. v. Ralston Purina Co.* (10th Cir.1975), 525 F.2d 749; *Westric Battery Co. v. Standard Electric Co.* (10th Cir.1975), 522 F.2d 986; *Texsun Feed Yards, Inc. v. Ralston Purina Co.* (5th Cir.1971), 447 F.2d 660; *Stott v. Johnston* (1951), 36 Cal.2d 864, 229 P.2d 348; *Dallman Co. v. Southern Heater Co.* (1968), 262 Cal.App.2d 582, 68 Cal.Rptr. 873; *Alber v. Standard Heating and Air Conditioning, Inc.* (1985), Ind.App., 476 N.E.2d 507; *First National Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345; *Lloyds of London v. Lock* (1983), Ind.App., 454 N.E.2d 81; *USF & G v. Peterson* (1975), 91 Nev. 617, 540 P.2d 1070; *Robert T. Donaldson, Inc. v. Aggregate*

*Surfacing Corp.* (1975), 47 A.D.2d 852, 366 N.Y.S.2d 194; *General Riveters, Inc. v. Morse Chain Co.* (1962), 15 A.D.2d 859, 224 N.Y.S.2d 746.

None of these cases involved a fact situation where a plaintiff claims that loss of business reputation is an element of damage for a mere breach of contract. *Dallman* involved the failure of a defendant to furnish materials and service to a plaintiff, and as a result, plaintiff could not fulfill its commitments. Several of the cases involved defendants who sold the plaintiffs defective products, which damaged plaintiff's customers. The resultant suits were for breach of warranty under the UCC. Those cases are: *R.E.B., Westric, Texsun, Stott, Donaldson,* and *General Riveters. Acra* was a case in fraud. *Alber* involved misrepresentation and a failure of consideration. Two of the cases concerned situations not dissimilar to *Vernon Fire and Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, discussed *infra* under punitive damages, where an insurance company refused to pay a claim. Those cases are *Lloyds* and *Peterson.* Language in *Westric* exists to the effect that future profits were denied because they were speculative. Where recovery of profits was permitted, it involved the interruption of a going business, or an act which hindered an ability to produce. *See Dallman, supra.* In each such case there has been some physical act which results directly to the detriment to the promisee. No authority exists for the proposition that future profits are recoverable for loss of face in the industry for breach of contract.

 Additionally, the evidence of THI's expert, Stephenson, is wholly conjectural. Economic factors such as the downturn in the economy, luck in bidding, and THI's reputation, apart from events here, are all critical variables, which have not been eliminated. We are compelled to quote Professor Corbin:

"It is not merely milkmaids who have rosy dreams as to the large gains to be made by selling the chickens to be hatched from the eggs to be bought with the price of the milk that was spilled by the defendant."

5 A. CORBIN, sec. 1022 at 138.

The trial court erred in granting compensatory damages for future profits. Judgment in this regard is ordered vacated.

ISSUE V: *Punitive Damages*

As heretofore stated, the trial court made no finding of the commission of the torts of interference with contractual relations and libel, alleged only against AEPSC in Counts II and III of the complaint. In fact, in Finding 28, under the heading of Punitive Damages, the trial court specifically negated the commission of those torts. Though the trial court made no finding of the commission of conversion and damages, which was charged in Count IV solely against I & M, it did, in Finding 28, find that both AEPSC and I & M had, for punitive damage purposes, committed the independent tort of conversion. Again, it made no finding of damages for that tort. Findings 28 and 29, and the Conclusions of Law, all relating to punitive damages, are set forth as follows:

"As to the allegations of tortious conversion, this Court does find there to have been an independent tort committed. The evidence clearly and convincingly shows that on February 22, 1979, [I & M] seized THI's cranes, elevators and other equipment for their own use, and for the use of THI's successor, Union Boiler. Since THI was not in default at the time of the seizure, [I & M's] actions were in defiance of the lawful title of [THI] to the property. The fact is, [I & M] didn't care whether their actions were proper. As previously stated, this action, as well as others, were part of a pattern whereby [I & M] operated in *total disregard* for the rights of THI. The deposition of Witness Hunter taken April 14, 1982 ... shows that [I & M] intended to keep [THI's] equipment because that was the cheapest, quickest way to get equipment for Union Boiler to use, rather than waiting for Union Boiler to get there with equipment of their own. Couple this with the fact that no one seems to have done an estimation of what the actual

responsibility of [THI] was as to finishing the contract, and it appears [I & M] was totally unconcerned with anything other than what they perceived as best for the Corporation.

The next issue in reaching punitive damages is whether the actions of [I & M] were shown by the evidence clearly and convincingly to have been done with oppression, malice, abusiveness or recklessness such as to warrant the finding of punitive damages.

Oppressiveness is defined as, "... an act of cruelty, severity, unlawful exaction or excessive use of authority." *Vernon*, [*supra* at 615, 349 N.E.2d at 184]. This Court believes this has been shown by this evidence clearly and convincingly. The evidence in this case is replete with examples of how [I & M's] employees attempted to exact from [THI] that which they were not due. The following are some examples:

(a) Before firing THI, neither I & M or AEPSC made any examination of lost time to see whether THI was in fact delinquent.

(b) The previously described letter of Hunter to the Indiana Air Pollution Control Board on February 2, 1979 was part of the pattern of conduct as previously stated.

(c) The contract bid provided that miscellaneous steel be shop-assembled rather than assembled at the site. THI requested extra pay to assemble at the site. Lopez asked Safi of the New York Contracts Office of Defendant AEPSC what the contract said. Safi agreed with [THI's] position. Lopez then indicated to [THI] they should continue with the work while the price they were to be paid was negotiated even though [I & M] had decided not to pay it. As a result, [THI] worked for some four months on these parts, then Lopez told them it was [THI's] obligation to do it under the contract. When [THI] refused, Lopez hired another contractor to assemble and then backcharged THI for the work. This was an obvious exaction from [THI] of something [I & M] had no right under the contract to do, at a cost to [THI] in excess of $40,000.

(d) The bid specifications required a tolerance of $\frac{1}{4}''$, but [I & M] thereafter required [THI] to meet tolerance of $\frac{1}{8}''$, a much more costly and arduous task, at no increase in pay, simply using its superior leverage to exact acquiescence from [THI].

(e) After the parties had agreed to the roof release agreement but before [I & M] had made payments to [THI], Lopez threatened to withhold payments to [THI] under that agreement unless THI accelerated the contract at its own expense quoting from his memo to Lehrer of November 16, 1978, ..., "I think they got the message...."

(f) Witness Lopez testified that at no time did he put any credence in the lost time reports filed by [THI], yet these same reports were furnished directly to the State of Indiana as [I & M's] reports as per Witness LeMasters, with no clarification at all. Lopez testified he saw no responsibility to report the true facts to the State. This Court sees this as further clear and convincing evidence of the willingness of [I & M] to do whatever was necessary to gain advantage to [I & M].

(g) Statements were made by witnesses Hunter and Lopez that [I & M] had no obligations under this Contract, that THI was the only one bound by this Contract.

(h) That the evidence establishes that the termination of a construction contractor never occurs without warning and/or ultimatum and chance to negotiate or cure the complaint, yet that is precisely what was done here.

(i) In testimony by Witness LeMasters concerning [I & M's] Exhibit 815, his notes reflect that Hunter had told Mr. LeMasters to report to the Indiana Air Pollution Control Board that [I & M] had threatened to fire [THI] on several occasions, a patently false statement. While this arguably does not rise to the standard of proof required for punitive damages by itself, this Court

certainly considers it cumulative of [I & M's] intent towards [THI].

(j) [I & M] gave [THI] a small contract to erect some parts of the hoppers, a total contract of $25,600, prior to the award of the main contract, with the intent of getting [THI] to fully mobilize, at their own expense, prior to even knowing whether they would get the contract. Evidence at trial shows the disappointment of [I & M] that THI only partly mobilized. Further, evidence at trial showed [I & M] was upset that [THI] did not fully assemble the hoppers, rather than just a few parts of them as contracted. This was totally unwarranted.

29. The one recurring point this Court has seen in this case is [I & M's] operation by means of a corporate mentality. Throughout the trial, the evidence clearly shows no instance of any one of [I & M's] employees taking responsibility. It refers always to a '... meeting at which we agreed ...' or '... everyone felt....' Witness White, by means of deposition stated he signed both the contract and the dismissal, but even he left this Court with the impression he was unaware of the particulars, that he was merely acting on advice given him, and then the process of tracing the location of that advice leads again to the same amorphous corporate mentality. It is this mentality, this 'we-ness', that shows itself in the actions of employees who sometimes coercively tried to save [I & M] relatively small sums of money and thus caused problems later costing much more. An example of this is the action by [I & M] of first accepting the penthouse roof, then rejecting the acceptance for a few days to avoid payment to [THI] of a few thousand dollars for being early, or another time agreeing to give [THI] an Extra Work Order, and then withdrawing it after [THI] did the work. This same mentality acts almost without volition in that it continues to move, seemingly without direction. The evidence is clear in this case that [THI] was not without its fault in this matter, but the final picture that emerges is that of a huge company, operating on conflicting demands to, on one hand make the largest profit possible, and on the other hand abide by Air Pollution Control Board regulations. This Corporation then contracted with a small construction company that was unconcerned with these pressures. When the pressure exerted upon [I & M] became too extreme, then something had to give, and since the people involved in this corporate mentality are not going to blame themselves, the obvious candidate was [THI], resulting in the firing and then this lawsuit."

*Record,* vol. XVII at 4509–13.

Relevant Conclusions of Law are as follows:

"(1) [I & M] breached the contract with [THI] and wrongfully converted [THI's] equipment to its own use.

(2) As a result of [I & M's] breach of contract, [THI] is entitled to recover compensatory damages, and is further entitled to recover punitive damages from [I & M] due to the clear and convincing evidence of [I & M's] oppressiveness, malice and reckless disregard of [THI's] rights under the contract and further because of the commission of the independent tort in connection with the breach.

(3) That [THI] is entitled to recover the specific amount of compensatory damages as hereinbefore detailed.

(4) That Defendants I & M and AEPSC are separate legal entities, but their wrongful actions herein in concert and cooperation were the joint, concurrent and proximate cause of the damages sustained by [THI] as described, such that judgment herein must be rendered jointly and severally against both Defendants.

(5) That [THI] proved the actions of [I & M] herein by a preponderance of the evidence, and that further the actions of tort, malice, oppression and recklessness were proved clearly and convincingly."

*Record,* vol. XVII at 4513–4.

■ *Vernon Fire and Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, is the definitive case address-

ing the recovery of punitive damages for breach of contract. Certain propositions in *Vernon* must be repeated here. Generally, punitive damages are not recoverable for breach of contract. *Id.* The relation between the parties is consensual, and obligations are owed only to specific individuals named in the contract. *Id.* Even as to these individuals, the damages recoverable are limited to those that are reasonably within the expectations of the parties when the contract is made. *Id.* In tort, a much broader measure of damages is applied. *Id.* Such limited measure of damages in breach of contract cases is to lend stability and predictability to the free enterprise system. *Id.* Thus, a promisor's motive for breaching a contract is generally regarded as irrelevant because the promisee will be compensated for all damages resulting from the breach. *Id.* As Justice Hunter stated:

"Where the facts surrounding the promisor's breach indicate sub-standard business conduct, the promisee may enjoy a limited sense of requital in taking his business elsewhere in the future, but he is not entitled to mulct the promisor in punitive damages."

*Id.* at 608, 349 N.E.2d at 180.

*Vernon* notes, however, that where the conduct of the breaching party also *"independently* establishes the elements of a common-law tort *such as fraud* [emphasis added]" punitive damages may be assessed. *Id.* The emphasized phrase, "such as fraud", suggests much more than mere negligent commission of a tort. In such cases the punitive damages are awarded for the tort, not on the breach of contract. A party must establish actual damage before he can recover punitive damages. *Hahn v. Ford Motor Co.* (1982), Ind.App., 434 N.E.2d 943, *trans. denied; Large v. Gregory* (1981), Ind.App., 417 N.E.2d 1160. *Vernon* also permits recovery of punitive damages for a serious wrong that is tortious in nature. The trial court made no finding upon this theory, and we will not address it.

■ Conversion is a tort involving the appropriation of personal property of an-

other to the tortfeasor's own use and benefit, to the exclusion of and in defiance of the owner's rights, under an inconsistent claim of title; mens rea is not an essential element. 6 I.L.E. *Conversion* sec. 11 (1958). Thus, the mere existence of the tort does not necessarily carry with it the imputations of malice, so even if the tortfeasor acted in good faith in assuming dominion over the property, such is no defense. *Howard Dodge & Sons, Inc. v. Finn* (1979), 181 Ind.App. 209, 391 N.E.2d 638. Lack of consent by the owner is an element. 6 I.L.E. *Conversion* sec. 13 (1958).

However, as suggested above, it has been established in a number of cases that an award of punitive damages for mere negligence is improper. Rather, the conduct supporting punitive damages must be of a more reprehensible character, e.g., malice, gross fraud, or oppressive conduct. *First Federal Savings & Loan v. Mudgett* (1979), Ind.App., 397 N.E.2d 1002; *Prudential Insurance v. Executive Estates* (1977), 174 Ind.App. 674, 369 N.E.2d 1117. *Prudential* eliminated the "heedless disregard for the consequences" element as a basis for punitive damages.

Language exists in the cases which indicates that the particular tort upon which the punitive damages are based must be accompanied with fraud, oppression, etc., and conduct wholly disconnected from the particular tort will not suffice, though it can be evidence of a state of mind. For example, in *Murphy Auto Sales, Inc. v. Coomer* (1953), 123 Ind.App. 709, 717, 112 N.E.2d 589, 592, the court stated:

"[W]here malice, fraud, oppression, etc. *enter into a tort,* exemplary damages may be assessed." (Emphasis supplied.)

In *Hibschman Pontiac, Inc. v. Batchelor* (1976), Ind.App., 340 N.E.2d 377, 385 (Garrard, J., concurring), *trans. granted,* 266 Ind. 310, 362 N.E.2d 845, Judge Garrard stated:

"To warrant punitive damages *the tort complained of* must be committed maliciously. The malice may be actual or constructive. Actual malice may be express or implied. Malice may be implied

from *commission of the tort* in a violent, abusive, insulting or oppressive manner." (Emphasis supplied.) [2]

It is to be noted that many, if not most, of the cases where punitive damages have been allowed in breach of contract actions have been consumer cases. *Vernon, supra; Mudgett, supra; Howard Dodge & Sons, supra; Jones v. Abriani* (1976), 169 Ind.App. 556, 350 N.E.2d 635; *Hibschman Pontiac, supra; Jerry Alderman Ford Sales, supra; Murphy Auto Sales, supra.* In *Jones, supra* at 580, 350 N.E.2d at 650, the court said:

> "It is well established that punitive damages are particularly appropriate in proper cases involving consumer fraud ... where the consumer is in an inferior bargaining position and is forced to either sign an adhesion contract or do without the item desired."

Nevertheless, punitive damages are not limited to consumer cases.

Two recent cases, *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019 and *Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, have signaled a substantial retreat from the liberality existing in the last fifteen years in the award of punitive damages. In *Travelers,* the court noted that there is no right to punitive damages; a plaintiff is merely the fortunate recipient of a windfall, designed to punish past conduct and deter future conduct. *Id.* In adopting the "clear and convincing evidence" standard, the court said:

> "In fact, it is incongruous to permit a recovery of that to which there is no entitlement upon evidence that barely warrants a recovery of that which is the plaintiff's absolute right. Yet, that is precisely what may occur when the inference of obduracy, from which punitive damages may flow, is permissible, but not compelled, from the same conduct from which compensatory damages flow, as a matter of right. To avoid such occurrences, punitive damages should not be allowable upon evidence that is

merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such noniniquitous human failing. For, just as we agree that it is better to acquit a person guilty of crime than to convict an innocent one, we cannot deny that, given that the injured party has been fully compensated, it is better to exonerate a wrongdoer from punitive damages, even though his wrong be gross or wicked, than to award them at the expense of one whose error was one that society can tolerate and who has already compensated the victim of his error. The public interest cannot be served by a policy that favors the latter over the former. And, just as the requirement of proof beyond a reasonable doubt furthers the public interest with respect to criminal cases, a requirement of proof by clear and convincing evidence furthers the public interest when punitive damages are sought.

The propriety of the clear and convincing evidence standard is particularly evident in contract cases, because the breach itself for whatever reason, will almost invariably be regarded by the complainant party as oppressive, if not outright fraudulent. Neither should it be assumed that one who stands to reap the harvest of a punitive damage award will, in all cases, himself be reasonable and forthright. Yet, as acknowledged in [*Vernon, supra*], the social cost of a rule which would make claims nondisputable would result in prohibitive social costs. As stated by Justice Hunter, who authored that opinion, 'Where the facts surrounding the promisor's breach indicates substandard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, *but he is not enti-*

---

**2.** In the opinion granting transfer, the supreme court disagreed with the court of appeals' application of the law to the facts, but not with its summary of relevant law.

tled to mulct the promisor in punitive damages.' 264 Ind. at 608, 349 N.E.2d 173. (Emphasis added.)

A rule that would permit an award of punitive damages upon inferences permissibly drawn from evidence of no greater persuasive value than that required to uphold a finding of the breach of contract—which may be nothing more than a refusal to pay the amount demanded and subsequently found to be owing—injects such risks into refusing and defending against questionable claims as to render them, in essence, nondisputable. The public interest cannot be served by any policy that deters resort to the courts for the determination of bona bide commercial disputes. 'The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs of a rule which would make claims nondisputable.' [*Vernon, supra.*]"

*Travelers, supra* at 362–3.

*Orkin* applied the clear and convincing standard announced in *Travelers* to tort cases. It likened the imposition of punitive damages to criminal actions with the same presumption of innocence:

"The rule is nothing more than the rule applicable in criminal trials resting entirely upon circumstantial evidence, i.e., the evidence must exclude every reasonable hypothesis of innocence."

*Orkin, supra* at 1023.

The law in New York is stated in the following cases. In *Halpin v. Prudential Insurance Company of America* (1979), 48 N.Y.2d 906, 907, 401 N.E.2d 171, 171, 425 N.Y.S.2d 48, 49, the court said that "[i]nasmuch as plaintiff's action is grounded upon private breach of contract, and does not seek to vindicate a public right or deter morally culpable conduct, punitive damages are not recoverable." *See also Vanderburgh v. Porter Sheet Metal, Inc.* (1982), 86 A.D.2d 688, 446 N.Y.S.2d 523 (a failure to perform promises of future acts is a breach of contract, not fraud, so punitive damages are not recoverable). In *Garrity v. Lyle Stuart* (1976), 40 N.Y.2d 354, 358, 353 N.E.2d 793, 795, 386 N.Y.S.2d 831, 833, the court stated that "[i]t has always been held that punitive damages are not available for mere breach of contract, for in such a case only a private wrong and not a public right, is involved." The court noted that the use of coercion is controlled by the state, not private persons. *Id.*

In the instant case, the trial court based the award of punitive damages upon the twin theories of "oppressiveness, malice and reckless disregard of [THI's] rights under the contract, and further because of the commission of the independent tort [of conversion] in connection with the breach." *Record,* vol. XVII at 4513. We will discuss them in order. In the arguments and in the findings, there is a confusing mixture of the two theories, making clarity of decision difficult.

Addressing the first theory, we observe that THI considers it to be the principal argument for punitive damages. In its brief, THI states:

"The key question with regard to the validity of the punitive damage award is whether there was any evidence of conduct by I & M and AEPSC which is inconsistent with noniniquitous human failing or overzealousness which society—in this case the business community—cannot tolerate. Or was there simply a good faith dispute?

The answer is that the termination of THI was devoid of good faith, extremely oppressive, done with knowledge of the harm it would cause THI, and fraudulently done with heedless disregard of the consequences."

*Appellee's Brief* at 195. In such argument, THI seeks punitive damages for wrongful breach of contract.

Throughout the argument THI argues the evidence generally set forth in the findings above. THI argues that it was entitled to lost time credit of 125 days; that it was not in default, but in fact it was 61 days ahead of an extended schedule. THI asserts that the project was 80% complete

at the time of discharge, but I & M committed fraud upon the court by presenting evidence at trial that the project was only 60% complete. THI further claims that I & M made no lost-time study to determine whether THI was delinquent, that THI was not bound by APCB's deadline and that THI was not required to mount an acceleration program at its own expense. THI also asserts that I & M's pretense of discharging it because it was behind schedule was a complete fraud. Finally, THI claims that I & M knew that being discharged would harm THI, but I & M did not care, and even attempted to maximize THI's damage by filing a counterclaim against it and its bonding company for damages. The harm THI alludes to is that argued in Issue IV, future profits.

■ As seen, the conduct for which THI seeks punitive damages is wrongful breach of contract. It is stated in *Vernon, supra* 264 Ind. at 607–8, 349 N.E.2d at 180:

"The well-defined parameters of compensatory and consequential damages which may be assessed against a promisor who decides for whatever reason not to live up to his bargain lend a needed measure of stability and predictibility to the free enterprise system. Thus, a promisor's motive for breaching his contract is generally regarded as irrelevant [citation omitted], because the promisee will be compensated for all damages proximately resulting from the promisor's breach [citation omitted]. Where the facts surrounding the promisor's breach indicate substandard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, but he is not entitled to mulct the promisor in punitive damages."

*Vernon* specifically stated that a breach of contract alone is insufficient to support punitive damages. The evidence argued by THI and stated in the findings and conclusions concerning I & M's disregard of THI's rights under the contract, or as we term it, "wrongful breach," is simply, under *Vernon*, not material. Every breach of contract involves a promisor's disregard of a promissee's rights under a contract. I &

M had it within its power without incurring punitive damages, to breach the contract with or without reason or excuse, be it good or bad. Its motive is not called into question. Conversely, if I & M had adequate reason to terminate the contract, not even a breach of contract, with resulting compensatory damages, would have resulted. *See* 6 I.L.E. *Contracts* sec. 230 (1958). Of course, as we have held, I & M must respond for actual damages.

As related to the independent tort of conversion, *Vernon* requires that before punitive damages can be allowed, "the conduct of the breaching party not only amounts to a breach of the contract but also *independently* establishes the *elements* of a common-law tort such as fraud." (Emphasis added.) *Vernon, supra* at 608, 349 N.E.2d at 180.

*Travelers* interprets the independent tort theory as meaning "evidence of an attendant *full blown* tort of a nature which would permit punitive damages in and of itself" (our emphasis). *Travelers, supra* at 360.

■ Damage to a plaintiff is an essential element to actionable negligence. *Neal, Admr. v. Home Builders, Inc.* (1953), 232 Ind. 160, 111 N.E.2d 280. Even fraud, without damage, is not actionable. *Wiley v. Howard* (1860), 15 Ind. 169. A party must establish actual damages before he can recover punitive damages. *Hahn, supra.* Though THI charged conversion in Count IV of its complaint, and asked for actual as well as punitive damages, the trial court made no finding of conversion with either actual or punitive damages under Count IV. Though THI argues that damage existed, no actual damages for conversion were found in the record at all. Conversion was brought over into Count I, the breach of contract count, to support punitive damages, but an element of the tort, damage, was omitted. Thus, tortious conversion, as a basis for awarding punitive damages for breach of contract, is seriously eroded because of the absence of an essential element, damage. *Vernon*, in addition to the independent tort exception, allows recovery of punitive dam-

ages when it appears from the evidence as a whole that, in addition to the breach of contract, a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort. THI briefly argues such a theory here. The trial court made only a finding of tortious conversion, and in Finding 28, (a) through (j), inclusive, were stated instances of conduct supporting the element of malice in tortious conversion. The other theory, mentioned for the first time in Conclusion of Law 2, was denominated as a "reckless disregard of [THI's] rights under the contract." *Record,* vol. XVII at 4513. We cannot enlarge upon the trial court's finding here.

Reliance upon tortious conversion as a basis for the award of punitive damages is further eroded by the failure of the trial court to recognize the legal effect of the contractual provision General Condition 28, which is the crux of the existence of conversion. The trial court further ignored THI's interpretation of this condition when THI billed I & M rental for the 4½ months of I & M's use. I & M has never questioned the fact that it owed THI rental, nor has I & M ever claimed ownership of the machinery. Reference to General Condition 28 is likewise evaded by THI in its argument here. At the termination of the contract, THI was, by its own evidence, 143 days behind the original contract schedule, which had never been formally extended. The immediate event which precipitated termination was THI's refusal to mount an acceleration program at its own expense, after which, I & M proceeded under General Condition 28. The delay is conceded. The causes of the delay are bitterly disputed in conflicting evidence. In proceeding under General Condition 28, had I & M been correct in its assessment that the causes of delay were THI's fault, then THI's claim for an extended schedule would have been groundless, and I & M would have had every right under General Condition 28 to retain temporary possession of the equipment situated on its property because of THI's prior contractual consent. The right to retain the equipment was thus contractual and was to be exer-cised by I & M upon the occurrence of the pre-condition—THI's failure to maintain schedule. In such event there would be no conversion. If THI was correct in its assessment of the amount and causes of delay, thus extending the contract schedule, it would not have been behind schedule. Under such circumstances, I & M's acts of terminating the contract and retaining the equipment temporarily would have been a breach of contract.

Thus, the rights between the parties to the temporary possession and use of the equipment were contractual. The breach of contract by the discharge of THI inextricably encompasses the breach of contract as to the right to the temporary possession of the equipment. It may then be concluded that the exercise of temporary possession and use of the equipment, without the occurrence of the pre-condition of failure to maintain schedule, was merely a breach of contract, and not an independent tort. Significantly, THI, in its complaint for breach of contract, so approached the problem. In Count I, the breach of contract count, the only basis for breach of contract is stated as follows:

> "Defendant I & M failed and refused to perform its obligations under the contract and breached the contract by failing and refusing to pay THI in the amounts and manner provided by the contract, and by wrongfully terminating the contract and seizing THI's equipment in February 1979...."

*Record,* vol. II at 373. Being a breach of contract, such is not a basis for punitive damages in and of itself under *Vernon* and other authorities.

Finally, we address the issue of whether the evidence in the case meets the draconian standards announced in *Vernon, Travelers, Orkin,* and *Bud Wolfe Chevrolet, Inc.* More specifically, do the evidence, and the findings thereon, demonstrate clearly and convincingly that I & M's acts were inconsistent with the hypothesis that its conduct was "the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such non-iniquitous human failing"? *Travelers,*

*supra* at 362. Does the evidence overcome the presumption of innocence? Is the evidence merely consistent with the hypothesis of fraud or quasicrime, which is insufficient? We are of the opinion that the findings and evidence do not meet those standards, either as to the independent tort theory or as to the so-called wrongful breach of contract theory.

In addition to the arguments set forth above, THI argues that I & M gave no notice of termination, gave THI no chance to correct deficiencies, and coerced the project engineer into signing the termination certificate. Additionally, THI makes arguments not covered by the trial court's finding concerning I & M's pre-contract and post-contract misrepresentations to APCB. As stated earlier, we cannot enlarge upon the trial court's findings.

We now proceed to analyze the facts most favorable to support the judgment, facts THI characterizes as malicious, oppressive, or reckless. Throughout the trial, THI presented evidence of negligence and mismanagement on the part of I & M in the execution of the project; of mistakes in drawings and specifications; of mislabeled and misfabricated materials and supplies; of improper design; of interference and delays caused by other contractors and subcontractors; and of delays caused by weather, all of which caused THI to be, without its fault, 143 days behind schedule. The photo exhibits contained in the record reflect that at the construction site there existed in varying stages of construction, a perfect mass of silos and stacks, and a web of girders which formed the skeleton of the precipitator. The interior of the structure was interlaced with a labyrinth of pipes, tanks, hoppers, and apparatuses. Adjacent to the construction site was a yard, stockpiled with mounds of construction materials. Also parked in the yard was an assortment of tractors, cranes, trucks, and other machines. The evidence shows that THI was not the only contractor, but other contractors and subcontractors were on the job, who were responsible for other phases of the total project. In all, a complex problem of construction scheduling and supervision devolved upon I & M as well as THI

and the other contractors, subcontractors, and suppliers. We do not perceive that any of the acts causing delay were, at most, anything more than negligence on the part of I & M. Certainly, the weather cannot be blamed on I & M. It is not argued that I & M deliberately caused any delay. We further do not perceive that the fault or cause of the delays was perfectly clear. The trial court found in Finding 29 that "[t]he evidence is clear in this case that [THI] was not without its fault in this matter...." *Record*, vol. XVII at 4512.

Finding 28, (a) through (j) inclusive, reflects the evidence of past quarrels between I & M and THI that existed throughout the entire contract period, commencing in September 1977, when THI notified I & M that it would not be responsible for the late start. Clearly, I & M made demands upon THI concerning compliance with the contract schedule, extra work without extra pay, an acceleration schedule at THI's expense, and the like. Equally clear is that THI categorically refused to comply with I & M's demands because it considered them to be outside the obligations imposed upon it by the contract. There does not seem to have been any subterfuge by I & M in making the demands, however unjustified they may have been. In its turn, THI made counterdemands for extensions of time, extra pay for extra work that it performed which it considered to be beyond its contractual obligations, and demands that I & M fund the acceleration program. At one point, THI even threatened to walk off the job if its demands were not met. It appears that I & M acquiesced to these demands sufficiently to escalate the contract price from $7,033,733.00 to $8,121,603.00. The refusal to implement an acceleration program at THI's own expense was the last of such demands and refusals, and was the cause of I & M to terminate the contract. These demands, counterdemands, refusals, and quarrels were characterized in Finding 28, (a) through (j) inclusive, by the trial court as "examples of how [I & M's] employees *attempted* to exact from [THI] that which they were not due." (Our emphasis.) *Record*, vol. XVII at 4510.

In Finding 24, paradoxically, the trial court found:

"It is clear to this Court that [I & M] believed [THI] had the obligation to give the additional services necessary to speed up release of the roofs and also at the same time speed up the entire contract as well at no additional cost to [I & M]."

*Record*, vol. XVII at 4502.

In short, it appears from the record, briefs, and findings that THI successfully defended itself at every turn from the attempts by I & M to exact from it what was not due. It is not recited, nor was it found, that I & M got anything that was not due. No authority has been presented, and we know of none, where punitive damages are permitted where even outrageous demands of a contracting party are rejected. The events referred to in Finding 28, (a) through (j) inclusive, were old, past matters, some of which were settled, and they were not the cause of the termination. Nor were they considered by THI to be the breach of contract. The cause of the termination was THI's refusal of I & M's demand that THI mount an acceleration program at its own expense. The breach of contract was the termination. THI treats the termination, and the taking possession of the equipment, as the only breaches of contract in its complaint. The trial court found that only the termination was a breach. The above quote from THI's brief reflects that the breach was the wrongful termination. In fact, upon termination, THI requested that the schedule be negotiated and that the contract be continued. Thus, the matters recited in Finding 28, (a) through (j), appear to have been resurrected and put on the scales only after litigation had been joined.

At trial, and here, THI relied heavily upon the critical path concept, explained elsewhere in this opinion. Insomuch as such critical path study was done only after litigation had commenced, its results cannot be used to demonstrate I & M's frame of mind during the course of the contract. Additionally, such concept measures only the amount of delay, not the cause. Conversely, THI, in what seems to be a major argument, makes much of the fact that, throughout the course of the contract, I & M did not request its personnel to conduct an examination of the circumstances to determine contract completion dates as extended, prior to termination. Again, since, under *Vernon*, a promissor may breach a contract for any reason he chooses without incurring punitive damages, so even the negligent failure to conduct such study to discover whether a proper reason to breach the contract existed, is not grounds for punitive damages. THI argues, and the trial court found, that I & M placed the interest of the corporation ahead of all other interests, without consideration of the facts or rights of others, by putting on its best face to APCB concerning the Breed precipitator. This evidence was in relation to the libel charge against AEPSC, in which THI claimed that I & M blamed it for the delay to APCB. Nevertheless, the trial court found against THI on its libel theory. No authority has been presented to demonstrate that self interest is a basis for punitive damages.

As seen, THI mainly argues wrongful breach of contract. I & M had a right to interpret its rights and obligations under the contract. It had the right to terminate the contract for whatever reason, without incurring punitive damages. The independent tort theory is deficient for lack of findings of all the elements, namely damages, and even if it were not deficient, the evidence and findings do not meet the exacting standards of *Travelers*.

This contract, as do most construction contracts, heavily favored the owner, I & M, whose engineer arbitrated disputes. Under all of the circumstances, the question of who was at fault on account of the delays, was a judgment matter. Experienced persons are aware, as argued by I & M, that in all sizable construction projects unforeseen problems develop with materials, interference, errors, labor, and weather. Such problems are of such frequency that they are anticipated in the contract, as here, and provisions are made for their resolution. Contractors allow for such contingencies in the amount of their bid. Gen-

eral Conditions 22, 27, and 28 addressed those contingencies. Change orders are provided for. In practice, resolution of conflicting demands frequently leads to disputes and quarrels. Here the quarrel centered around who should bear the burdens of correcting the problems and the cost of an acceleration program. Though acknowledging some merit to THI's complaints, I & M's principal position is that the complaints were greatly exaggerated. Under *Vernon* I & M is entitled to exercise its judgment. Conflicting claims are not to be made indisputable.

THI characterizes the acts of I & M as malicious and oppressive. We are of the opinion that, at worst, the complained of conduct was substandard business practice, and arrogance, which under *Vernon* and *Travelers* are not bases for punitive damages. This is not a consumer case, nor an insurance case, nor does I & M stand in the position of a fiduciary to THI (although THI attempts to assume the position of a helpless consumer, as in *Jones, supra*). THI's principal, recurring theme is I & M's unsuccessful attempt to exact from THI what was not due. I & M's striving for advantage is neither unusual nor particularly shocking in the give and take of the commercial world. No case is cited which holds that such conduct is a basis for punitive damages. We are equally unpersuaded that the personality defects of I & M's officers, described by the trial court in Finding 29 as exhibiting on "amorphous corporate mentality," add any weight to the award of punitive damages. *Record*, vol. XVII at 4512. We know of no authority that permits the imposition of punitive damages merely because the contracting party or his agents are disagreeable people. We do not believe such a trait, however annoying, is a quasi-crime. Additionally, the world abounds in huge corporations, conglomerates, cartels, syndicates, holding companies, government bureaus, and the like, all of which could be described as without shape or form to an outsider.

It is not our perogative to reopen the floodgates of punitive damages in contract cases, which were largely closed by the supreme court in *Vernon, Travelers,* and

*Orkin,* and let all disputes and quarrels over broken contracts and disappointed business ventures become the subject of acrimonious litigation over punitive damages. Conflicting claims in the commercial world are not to be made indisputable; *Vernon* sets the policy as follows:

> "Appellants acknowledge the foregoing rule allowing punitive damages, but maintain that their conduct in dealing with their insured reflects nothing more than a legitimate exercise of an insurer's 'right to disagree' as to the amount of recovery, citing *Meridian Mutual Insurance Co. v. McMullen* (1972), 152 Ind. App. 141, 282 N.E.2d 558. It is evident that the exercise of this right may directly result in the intentional infliction of temporal damage, including the damage of interference with an insured's business (which an insured will undoubtedly consider to be oppressive). The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than its costs, i.e., the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs which would make claims nondisputable."

*Vernon, supra* 264 Ind. at 609–10, 349 N.E.2d at 181.

It is clear from the authorities that the right to impose penal sanctions is basically reserved to the State. Such power is not delegated to a litigant, who will gain from the outcome, because he is not a neutral prosecutor, and human avarice presents a dangerous temptation. Additionally, the singular lack of predictable guidelines to define the elements of the proscribed conduct for which the penalty is imposed, and the amount of penalty itself, as in criminal law, arouses caution. There is an understandable hesitancy to permit a court or jury to fashion both the offense and the penalty out of whole cloth. Thus, *Travelers* imposes a severe restraint upon the trier awarding penal damages.

This issue is reversed, and the trial court is ordered to vacate the award of punitive damages.

**ISSUE VI:** *Discovery*

I & M claims that the trial court committed "egregious" error in refusing to grant discovery. This issue is broken down as follows:

■ (a) *Damages:* Discovery had been completed to a large extent, but on February 19, 1982, the trial court ordered the discovery updated. I & M argues here that THI did not comply, because its answers were general. On April 20, 1982, I & M filed a pre-trial motion to exclude the evidence or grant a continuance, which was denied. At the trial that commenced on May 10, 1982, I & M made numerous objections to the introduction of evidence because of lack of discovery. However, I & M, in its brief, does not state the nature of the evidence, nor does it set out the objections. The evidence objected to here was entered by THI on May 17, 1982, and the trial was not concluded until December 14, 1982. In the interim, there were no motions for continuance, nor efforts on I & M's part to update their own evidence based on the testimony of THI witnesses. Failure to request a continuance at the time evidence is entered is fatal to discovery issues. *Bay v. Barenie* (1981), Ind. App., 421 N.E.2d 6. Nevertheless, we need not rest our decision there. Though I & M claims it was prejudiced by a lack of discovery, the only identifiable area of prejudice mentioned in its brief concerns the issue of future profit in the amount of $2,900,000.00, which issue we have already ruled upon in I & M's favor. I & M has not cogently argued any other area of prejudice because of a lack of discovery, and has waived any issue in regard thereto. I & M has not demonstrated reversible error.

■ (b) *Critical Path Model:* I & M claims that THI's expert witness, Stephenson, prepared, after litigation had commenced, a document referred to as a "critical path model," heretofore discussed. I & M's attempt to discover it was denied on the basis that it was work product, but the trial court also denied THI the right to use it in court. Though I & M denies that the document was work product, I & M designated it as such, in its seventh request for documents, as "a copy of all Critical Path Models prepared by [THI's] expert witness, Ralph Stephenson, in connection with this litigation." *Record,* vol. V at 1014. As heretofore noted, the critical path method is an analysis. Under Ind. Rules of Procedure, Trial Rule 26(B)(3), material prepared in anticipation of litigation is discoverable "only upon a showing that the party seeking the discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the material by other means." In its brief I & M makes no such showing. Some of I & M's witnesses testified that they understood the critical path analysis and could have made such analysis from the same basic information as was available to Stephenson. Also, I & M had supervisory personnel on the job at all times, and the amount and causes of delay were as available to it as they were to THI. The evidence was first presented on May 10, and I & M had sufficient time up until December 14 to meet the critical path evidence. A trial court's action in discovery matters is reversible only for an abuse of discretion. *Kaufmann v. Credithrift Financial, Inc.* (1984), Ind.App., 465 N.E.2d 207. I & M has not demonstrated reversible error.

**ISSUE VII:** *Failure to Make Certain Findings*

■ I & M argues that the trial court failed to make special findings in regard to certain issues, as follows: (1) the contract extensions, if any; (2) credits due I & M under the contract and acceleration program; (3) the status of the job at termination; (4) the time when THI could have been expected to complete the contract work; (5) the delays to the job progress caused by THI's own fault, acts, and omissions; (6) the apportionment of delays; and (7) various specifics relating to compensatory damages. I & M correctly cites *Malbin & Bullock, Inc. v. Hilton* (1979), 180 Ind. App. 193, 387 N.E.2d 1332, as authority that findings are to be construed together, and that the purpose of special findings is to provide the parties and reviewing courts

with the legal theory upon which the judge decided the case. The case held that whether the findings are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached. *Id.* at 195–6, 387 N.E.2d at 1334. The trial court, in Findings 12, 20, 21, 25, and 29 found that, because of the various problems of late start, misfabrication, labor unrest, weather, and the like, which were beyond the control of THI, the contract, under its provisions, should have been extended by at least 125 days. The trial court also made findings concerning acceleration credit, and found that THI was not without fault.

Essentially, the trial court found, as matters here, that, because of delays beyond the control of THI, it was not in default because the crucial deadlines had been extended at the time of discharge. Therefore, I & M breached its contract. The trial court was not required to make findings of evidentiary fact, only ultimate fact. *Salk v. Weinraub* (1979), 271 Ind. 115, 390 N.E.2d 995. I & M has not demonstrated reversible error.

ISSUE VIII: *Liability of AEPSC*

The record discloses that AEPSC was not the contracting party, but did plan and execute the project in the name of I & M, the sole contracting party. Suit was brought solely against AEPSC in Count II for tortious interference with the contractual relationship between THI and I & M. In Count III, THI brought suit solely against AEPSC for libel. No claim was made by THI against AEPSC for breach of contract or conversion; those charges were leveled solely at I & M. The trial court found for AEPSC on both Count II and Count III. Since the complaint did not frame the issue that AEPSC acted in concert, and was thereby somehow liable on Count I, breach of contract, we are at a loss as to why a judgment that AEPSC was jointly liable was entered. I & M's brief is not helpful. Its sole argument, omitting citations of authorities, is as follows:

"The trial court erred in entering judgment against AEPSC on the basis that it acted in concert with I & M in jointly causing THI damage. AEPSC, however, cannot be liable for acts performed as the disclosed agent of I & M acting within the scope of its authority.

The uncontradicted evidence presented at trial conclusively established that AEPSC was, at all times, acting as the disclosed agent for I & M. As such, the trial court committed reversible error in rendering a judgment, jointly and severally, against both I & M and AEPSC."

*Appellant's Brief* at 165.

These bare assertions, containing a footnote citation to the humongous record, is all that it presented. Clearly, I & M has not complied with A.R. 8.3(A) by presenting a cogent argument.

■ The record discloses that AEPSC and I & M are both wholly-owned subsidiaries of the parent holding company, AEP. Though I & M was the contracting party, the project was planned, bid, and executed by AEPSC. AEPSC told the contractors when to start, when to stop, and issued change orders. Willis White, Jr., Chairman of the Board for I & M, described himself as an employee of AEPSC. AEPSC, upon its own authority, made the decision to discharge THI. In spite of the procedural infirmities, this issue may have been litigated by consent. It does appear that the entities are indistinguishable, and the record supports the trial court's conclusion. The burden rests upon I & M to demonstrate error. It has not done so.

In recapitulation, we reverse the award to THI of certain specifications of damages as follows: recoupment of attorney fees paid by THI to ICNA in the amount of $27,817.00; future profits in the amount of $2,900,000.00; and punitive damages in the amount of $12,000,000.00. The trial judge is directed to enter an order vacating these amounts. The judgment is affirmed as to all other respects. All costs are to be assessed to I & M.

Judgment reversed in part, affirmed in part.

ROBERTSON, J., concurs.

RATLIFF, C.J., concurs with opinion.

RATLIFF, Chief Judge, concurring.

I agree that it was proper to decide this case on the basis of Indiana law, but I arrive at this conclusion by a different route than that traveled by the majority. Contract provisions specifying that the contract shall be governed by the law of a particular jurisdiction are not without limitation. Generally, for such provisions to be given effect, the state whose law is specified as controlling must have some direct, real, substantial, or significant relationship with the subject of the contract. 16 Am. Jur.2d, *Conflict of Laws* § 78. The parties may not arbitrarily select the law of a state which has no substantial relationship to the contract. *Id.* Applying this standard, Indiana law clearly controls. Both Terre Haute Industries and Indiana and Michigan Electric are Indiana corporations. I and M has its principal office in Fort Wayne, Indiana, and serves customers in Indiana and Michigan. THI had a facility in Terre Haute and also had offices in Michigan. The contract in question was to be fully performed at I and M's facility in Indiana. No work was to be done or performed in New York. The contract was executed on behalf of THI by its chief executive officer in Chicago. Thus, this case involves a contract between two Indiana corporations for work to be performed entirely within Indiana. New York had no real or significant relationship with the contract or the subject of the contract. The contract provision specifying the law of New York as controlling is not entitled to be given effect. The case was properly decided on the basis of Indiana law.

Also, I take exception to the language used by the majority on page 616 of the slip opinion wherein it is stated that I and M "had the *right* to terminate the contract for whatever reason, without incurring punitive damages." (Emphasis added). This is tantamount to saying a party has a right to break a contract. No party has a *right* to break a contract, rather, only the *power* to break the contract exists, subject to whatever legal consequences may attend that action.

In the discussion of Issue VI: Discovery, under (b) Critical Path Model, at pages 618–619 of the slip opinion, the majority confuses "work product" with "material prepared in anticipation of litigation." They are not the same. *American Buildings Company v. Kokomo Grain Company, Inc.* (1987), Ind.App., 506 N.E.2d 56, Judge Sullivan's opinion in *American Buildings* contains an excellent discussion of these two different concepts. The materials involved in this case were materials prepared in anticipation of litigation, not work-product. Although the majority uses the term "work product," as well as "materials prepared in anticipation of litigation," it is clear the opinion is based upon an application of the discovery rules pertaining to the latter concept that such rules were applied properly. I concur in the majority's resolution of this issue.

In all other respects, I concur in the majority opinion.